2015 ME 107

OPINION OF THE JUSTICES
OF THE SUPREME JUDICIAL COURT

GIVEN UNDER THE PROVISIONS OF
ARTICLE VI, SECTION 3 OF THE MAINE CONSTITUTION

Docket No. OJ-15-2

_____

QUESTIONS PROPOUNDED BY HIS EXCELLENCY,
PAUL R. LEPAGE, GOVERNOR OF THE STATE OF MAINE

IN A COMMUNICATION

DATED JULY 17, 2015

ARGUED JULY 31, 2015

ANSWERED AUGUST 6, 2015

_____

QUESTION PROPOUNDED BY THE GOVERNOR
IN A COMMUNICATION DATED JULY 17, 2015

To the Honorable Justices of the Supreme Judicial Court:

Please accept my request for an Opinion of the Justices of the Maine Supreme Judicial Court pursuant to Article VI, Section 3 of the Maine Constitution. I seek your advice upon important questions of law regarding my constitutional obligation to faithfully execute the laws, specifically, 65 bills vetoed by me on July 16, 2015, 17 of which are emergency legislation.

When the Legislature adjourned on June 30 with no date to reconvene, I was prevented from returning the bills to their houses of origin. This triggered the constitutional provision that I could hold the bills until the Legislature reconvened for three consecutive days. The Legislature reconvened on July 16, providing the earliest opportunity to return the bills since the Legislature's adjournment. I promptly returned all 65 vetoes to their respective houses of origin on that date.

The Legislature's failure to timely extend the first regular session beyond the statutory adjournment date of June 17, then adjourning on June 30 with no date of return, has resulted in a dispute over the validity of the 65 bills. Now that the Legislature has refused to consider the vetoes, insisting that the bills have already become law, my constitutional duty as Governor to "take care that the laws be faithfully executed" is in question. I must know whether the 65 bills have become law.

To determine this, I must know what type of adjournment prevents the return of a bill to the Legislature. I must know whether the Legislature triggered the constitutional three-day procedure for the exercise of the Governor's veto. And finally, I must know whether the 65 bills I returned to the Legislature on July 16 were presented properly before that body for reconsideration.

FACTUAL BACKGROUND

The first regular session of the 127th Legislature began on December 3, 2014. Over the course of the session, the Legislature enacted bills and presented them to me for action. I signed numerous bills into law; I allowed others to become law without my signature; I vetoed many others. The statutory

adjournment date for this session was June 17, 2015. Despite knowing the statutory adjournment date—a date published in numerous Legislative calendars—the Legislature failed to timely extend the session by the close of the June 17 meeting. This is so even though a Joint Order to extend the first regular session by five legislative days was prepared on June 17 (Exhibit 1, SP 549). That Joint Order was never presented, however. Instead of timely extending the first regular session, the Legislature simply adjourned and returned on June 18, creating a question around its legal authority to reconvene the session at all. A verbal motion to extend the session (which had arguably already ended by operation of law) was passed in the House (Exhibit 2, Roll Call #296) and in the Senate (Exhibit 3, Remarks, and Exhibit 4, Roll Call #288)[1]. The Legislature then met on June 19, 22, 23, and 24. On June 24, the Legislature attempted, by Joint Order, to further extend the session by five more legislative days (Exhibit 5, HP 991). At the close of that day, the Senate and House adjourned until June 30, 2015 at 10:00 in the morning (Exhibit 6, SP 550). In contrast, at the close of the June 30 meeting, the Legislature, by Joint Order, adjourned "… until the call of the President of the Senate and the Speaker of the House, respectively, when there is a need to conduct business or consider possible objections of the Governor" (Exhibit 7, SP 556). The Joint Order did not set any date certain on which the Legislature would reconvene.

Pursuant to the Maine Constitution, Article lV, Pt. 3, §2, when the Legislature is in session, I have 10 days (excepting Sundays) in which to return bills with my objections to their legislative houses of origin. The Constitution also provides, however, that if "the Legislature by their adjournment prevent [a bill's] return", there is an alternative veto process that ensures that the Governor has the opportunity to exercise his veto power and that the Legislature has time to reconsider the bill in light of the Governor's objections. That process allows the Governor to return the bills "within 3 days after the next meeting of the same Legislature which enacted the bill …."

Prior to June 30, I had received 23 bills from the Legislature, six of which were emergency bills. The respective deadlines for return of these bills were all

---

[1] The failure of the Legislature to properly extend the first regular session along with their subsequent attempt to do so after the session was statutorily adjourned was not discovered by the Governor's counsel until early July.

3

later than June 30. Just prior to its adjournment on June 30, the Legislature presented me with an additional 58 bills, 14 of which were emergency bills. The deadline for the return of these bills would have been July 11, 2015 if the Legislature had been in session.

Instead, the Legislature conditionally adjourned on June 30 with no date for its return. Moreover, the indefinite condition that could have prompted its return—the call of the Senate President and Speaker of the House—did not come to pass on or before July 11. In fact, while there were unofficial reports that the legislators would reconvene on July 16, the legislative record confirms that the date for reconvening was ambiguous at best (Exhibit 8, House Legislative Record on HP 991, Rep. Fredette's remarks). By their adjournment without a set date of return, I was prevented from returning these bills to their houses of origin.

Believing these circumstances triggered the constitutional three-day procedure[2], I held the bills until the Legislature reconvened, understanding that the Constitution afforded me the opportunity to hold the bills until the Legislature reconvened for four consecutive days. *See Opinion of the Justices,* 437 A.2d 597 (1981) and *Opinion of the Justices*, 484 A.2d 999 (1984). I had the opportunity to consider the bills and draft objections. Consequently, when the Legislature reconvened on July 16, I returned them within the time allowed me under the Constitution. July 16 was the very first opportunity after the Legislature's June 30 adjournment when I could return the bills. I returned the bills to their appropriate houses of origin with a request to the Legislative leadership that they reconsider the bills in light of my objections. The Speaker of the House refused to reconsider the bills, maintaining that they were laws that at his direction had already been chaptered. After refusing to reconsider the bills and my objections, the Legislature adjourned on July 16, 2015, using the words, "adjourned without day" in the House and "adjourned sine die" in the Senate, respectively.

I have a constitutional duty, as Governor, to "take care that the laws be faithfully executed" (Me. Const. Art. V Pt. 1, §12). Accordingly, I must know

---

[2] *See Bands of the State of Washington v. United States and Okanogan, Methow, San Poelis, Nespelem, Colville, and Lake Indian Tribes v. US*, 279 U.S. 655 (1929) and *Wright v. United States*, 302 U.S. 583 (1938). While these cases address "pocket vetoes" pursuant to the United States Constitution and the instant situation is not a question of a pocket veto, the language and analysis used by the U.S. Supreme Court is pertinent to the questions raised in this letter.

whether the 65 bills I was prevented by the Legislature's adjournment from returning to their houses of origin by July 11 have become law. This is a particularly pressing issue because 17 of these bills are emergency legislation, meaning they are effective immediately after the conclusion of the session. There is no dispute that at this time, the first regular session of the 127th Legislature is over; the exact date of the end of the session is likely disputed, however. I must know whether the three-day procedure was triggered by the Legislature's action or inaction during and/or after the session. If so, the exercise of my veto power and the return of the bills on July 16 kept those bills from "having the same force and effect as if" I had signed them.

With great deference, therefore, I respectfully submit to you that these facts present the "important questions of law" and "solemn occasion" necessary to invoke your constitutional authority to issue advisory opinions under Article VI, Section 3 of the Maine Constitution. There can be no doubt that the validity of the laws at issue is a constitutionally important question. Likewise, according to a 1975 Opinion of the Justices, "for it to be a solemn occasion ... the questions must not be 'tentative, hypothetical and abstract ...." *Opinion of the Justices*, 330 A.2d 912, 915 (Me. 1975). "Subjects of advisory opinions must be "of instant, not past nor future concern; things of live gravity." *Opinion of the Justices*, 134 Me. 510, 513, 191 A. 487 (1936). The questions of whether the constitutional three-day procedure was triggered by the Legislature's action or inaction, including but not limited to its failure to legally extend the session and/or its conditional "adjournment without day" raise sufficiently important legal questions that must be answered because the faithful discharge of my constitutional duty to execute numerous laws depends on the answers. Moreover, the guidance I seek is needed with respect to matters of instant concern and live gravity.

## QUESTIONS

The Constitution of the State of Maine provides in pertinent part,

> If the bill or resolution shall not be returned by the Governor within 10 days (Sundays excepted) after it shall have been presented to the Governor, it shall have the same force and effect as if the Governor had signed it unless the Legislature by their adjournment prevent its return, in which case, it shall have such force and effect, unless returned within 3 days after the next meeting of the same Legislature which enacted the bill or resolution …

Me. Const. Art. IV, pt. 3, §2.

The Constitution further provides, in pertinent part, "The Legislature shall enact appropriate statutory limits on the length of the first regular session …" Pursuant to this constitutional mandate, the Legislature enacted 3 M.R.S. §2, which provides in pertinent part, "The first regular session of the Legislature, after its convening, *shall adjourn no later than the 3rd Wednesday in June …*" [emphasis added].

In order to fulfill my constitutional obligation to faithfully execute duly passed, constitutionally sound laws, I must have answer[s] to the following question[s]:

l) What form of adjournment prevents the return of a bill to the Legislature as contemplated by the use of the word, adjournment, in Art. IV, pt. 3, §2 of the Maine Constitution?

2) Did any of the action or inaction by the Legislature trigger the constitutional three-day procedure for the exercise of the Governor's veto?

3) Are the 65 bills I returned to the Legislature on July 16 properly before that body for reconsideration?

In light of the constitutional importance of these questions as well as the need now for guidance on how to appropriately meet my constitutional duty to faithfully execute the laws, I request the Court provide its answers to these questions as promptly as the Court is able. I would be happy to expeditiously provide any briefing requested by the Justices.

Sincerely,
/s/
Paul R. LePage
Governor

OPINION OF THE JUSTICES

To His Excellency, Paul R. LePage, Governor of the State of Maine:

[¶1] Pursuant to article VI, section 3 of the Maine Constitution, it is our honor to respond to Questions presented by Governor Paul R. LePage, who seeks the advice of the Supreme Judicial Court regarding the status of certain bills that were acted on by the 127th Maine Legislature in its First Regular Session.

[¶2] We invited input from the Governor's Office, the Legislature, and interested members of the public. We received briefs from Governor LePage; the President of the Senate, by and on behalf of the Maine Senate, and the Speaker of the House, by and on behalf of the Maine House of Representatives; the Attorney General; several Republican Members of the House of Representatives; the ACLU of Maine Foundation; Planned Parenthood of Northern New England and other medical organizations; and several interested members of the public. Oral Argument on the Questions was held on July 31, 2015.

[¶3] After thoroughly considering the Governor's Questions, the briefs and arguments presented, the Maine Constitution and laws, the history and practices of Maine Governors and Legislatures, and analogous jurisprudence from other jurisdictions, all participating Justices being in agreement, we have the honor of providing the following response.

## I. DISCUSSION

### A. Solemn Occasion

[¶4] Before addressing the Questions, we are required by the Maine Constitution to determine whether each of the Questions presents a solemn occasion. The Constitution provides that "[t]he Justices of the Supreme Judicial Court shall be obliged to give their opinion upon important questions of law, and *upon solemn occasions*, when required by the Governor, Senate or House of Representatives." Me. Const. art. VI, § 3 (emphasis added). Thus, we must determine whether each Question presents a solemn occasion "that confers on us the constitutional authority to answer the questions propounded." *Opinion of the Justices*, 2015 ME 27, ¶ 17, 112 A.3d 926.

[¶5] "'A solemn occasion arises when questions are of a serious and immediate nature, and the situation presents an unusual exigency.'" *Id.* ¶ 18 (quoting *Opinion of the Justices*, 2012 ME 49, ¶ 5, 40 A.3d 930). "'[S]uch an exigency . . . exists when the body making the inquiry, having some action in view, has serious doubts as to its power and authority to take such action under the Constitution or under existing statutes.'" *Opinion of the Justices*, 2002 ME 169, ¶ 6, 815 A.2d 791 (quoting *Opinion of the Justices*, 709 A.2d 1183, 1185 (Me. 1997)). Only where the "facts in support of the alleged solemn occasion are clear and compelling," will we determine that a solemn occasion exists. *Opinion of the*

*Justices*, 2015 ME 27, ¶ 18, 112 A.3d 926 (quotation marks omitted). We will only answer questions that "concern a matter of live gravity," *Opinion of the Justices*, 2012 ME 49, ¶ 6, 40 A.3d 930 (quotation marks omitted), and are "sufficiently precise for the justices to be able to determine the exact nature of the inquiry," *Opinion of the Justices*, 2004 ME 54, ¶ 40, 850 A.2d 1145 (quotation marks omitted).[1]

[¶6]  Historically, we have concluded that the facts are "clear and compelling" where the question "involves constitutionally mandated conduct on the part of the Governor under circumstances where the Governor has serious doubts as to his power and authority." *Opinion of the Justices*, 2002 ME 169, ¶¶ 8, 11, 815 A.2d 791 (alteration omitted) (quotation marks omitted); *see also Opinion of the Justices*, 343 A.2d 196, 202 (Me. 1975) (determining that a solemn occasion exists where the Governor was faced with the choice to "either act or refuse to act *now*").

[¶7]  Although we will not answer "questions from one branch of the government inquiring about the power, duty, or authority of another branch," *Opinion of the Justices*, 709 A.2d at 1185, when those duties and authorities

---

[1] We do not answer "questions that are tentative, hypothetical and abstract." *Opinion of the Justices*, 2015 ME 27, ¶ 18, 112 A.3d 926 (quotation marks omitted); *see also Opinion of the Justices*, 460 A.2d 1341, 1345 (Me. 1982) (declining to answer a "hypothetical" question, the "resolution of which may involve determination of facts and application of provisions of law other than the terms of the Act" at issue).

4

overlap or intertwine, we may respond. Addressing such an occasion, we responded to Governor John R. McKernan Jr.'s question regarding whether the Legislature could enact certain legislation without the approval of the Governor, *see Opinion of the Justices*, 571 A.2d 1169, 1179-81 (Me. 1989), and Governor Angus S. King's questions regarding whether the Legislature had authority to enact certain legislation at a Special Session, *see Opinion of the Justices*, 680 A.2d 444, 445-49 (Me. 1996).

[¶8]  In the matter before us, Governor LePage's Questions ask us to provide him guidance in carrying out his responsibilities as the Chief Executive. Specifically, the Questions involve the status of multiple bills that were passed by both Houses of the Legislature and delivered to the Governor near the end of the First Regular Session of the 127th Maine Legislature.  Whether those bills now have the force and effect of law, or are not yet law because they await the Legislature's action on the Governor's objections, will determine whether the Governor takes actions to enforce and effectuate those laws.  Some of the bills were passed as emergency legislation.  The urgency of potential emergency legislation and the sheer number of bills in dispute create a significant issue of grave public interest.  Cognizant that an Opinion of the Justices is not an adjudication, and is advisory only, we take the Governor at his word that he seeks the input of the Justices in order to "take care that the laws be faithfully executed."

[¶9]    In addition, and as discussed at Oral Argument, the Governor's alternative argument that the Legislature was finally adjourned on June 17, 2015, by operation of statute, 3 M.R.S. § 2 (2014), creates a question as to the efficacy of all legislative action after that date.  *See* Me. Const. art. IV, pt. 3, § 16.  This creates additional immediate and urgent questions for the Governor, given his institutional responsibility for enforcing the laws, and planning and budgeting for implementation of that legislation.

[¶10]    On these facts, we have no difficulty determining that a solemn occasion has been presented.  We are careful, however, to answer only those Questions that are specific to the circumstances confronting the Executive Branch and relevant to the specific facts presented here.  Thus, in one instance, we answer the Question presented only in part.

B.    Factual Background

[¶11]    The critical facts are not in dispute except where noted.  The First Regular Session of the 127th Maine Legislature was convened on December 3, 2014.  The statutory adjournment date for this legislative session was the third Wednesday in June, or, more specifically, June 17, 2015.  *See* 3 M.R.S. § 2 ("The first regular session of the Legislature, after its convening, shall adjourn no later than the 3rd Wednesday in June . . . .").  Pursuant to 3 M.R.S. § 2, the Legislature

6

prepared a Joint Order to extend its session by five legislative days on June 17th, and the Order passed both Houses on June 18th.

[¶12]   On June 23rd, the Legislature again extended its session by five legislative days.  *See id.*  The following day, the House announced its intention to return on or about June 30 and July 16, 2015, to deal with bills that were still awaiting the Governor's signature.  *See* Legis. Rec. H-\*\*\* (June 24, 2015, 1st Reg. Sess. 2015).   On June 26th, the President of the Senate and the Speaker of the House sent a memorandum via email to all of the members of the 127th Legislature, stating that they were "anticipating the potential for morning, afternoon and evening sessions" on June 30; July 1; and July 16, 2015.

[¶13]  On June 30, 2015, the Legislature adjourned.  The Senate Advanced Journal and Calendar reflects the following Joint Order from June 30, 2015:

> Ordered, the House concurring, that when the House and Senate adjourn they do so until the call of the President of the Senate and the Speaker of the House, respectively, when there is a need to conduct business, or consider possible objections of the Governor.

Sen. Advanced Jour. & Calendar, Supp. No. 31, S.P. 556 (127th Legis. June 30, 2015).  The order of adjournment did not contain a date certain for return.

[¶14]  When the Legislature adjourned on June 30, 2015, eighty-one bills,[2] for which the constitutionally-established ten-day period had not yet expired, awaited the Governor's action.

[¶15]  The Governor did not return the bills with his objections within ten days.  Instead, asserting that he had the constitutional authority to present the bills when the Legislature next convened for more than three days, the Governor returned sixty-five of the eighty-one bills to the Legislature with his vetoes on July 16th, when the Legislature returned at the call of the President of the Senate and Speaker of the House.  The Legislature, through its leadership, announced that the Governor's vetoes of the sixty-five bills had been returned outside of the constitutionally-established ten-day period; declined to act on the Governor's objections; and reported to the Governor through the Clerk of the House and Secretary of the Senate that the bills had become law.  Acting pursuant to 1 M.R.S. §§ 91-95, 361-363 (2014), the Office of the Revisor of Statutes began processing the bills that the Governor had not returned within the ten-day period as enacted Public Laws to be incorporated into the Maine Revised Statutes.

---

[2]  The Governor indicates that eighty-one bills awaited his action after the Legislature adjourned on June 30th—twenty-three bills presented to him prior to June 30th and fifty-eight bills presented to him on June 30th, but there is disagreement surrounding the exact number of bills at issue.  The Attorney General reports in her brief that the Governor had eighty-five bills on his desk when the Legislature adjourned—three of which he returned unsigned on July 1st and seven of which he signed into law between July 1st and July 8th.  The Legislature's website appears to suggest that the Governor had eighty-two bills on his desk as of the Legislature's June 30th adjournment.  This uncertainty as to the exact number of bills at issue is not relevant to our analysis of the laws at issue.

8

[¶16]  At the close of business on July 16, 2015, the Legislature adjourned sine die.[3]  Following the adjournment sine die of the First Regular Session of the 127th Legislature, the conflict and uncertainty between the Legislative and Executive Branches of government regarding the status of the sixty-five bills—the Legislature declaring that the bills are valid laws, and the Governor believing that he has duly vetoed the bills—led to the Governor's Questions that we address today.

C.    Summary of Issues Presented

[¶17]  Reduced to its simplest form, the immediate question presented by all three of the Governor's inquiries is whether, when the 127th Maine Legislature adjourned on June 30, 2015, "until the call of the President of the Senate and the Speaker of the House," the Legislature "prevented the return" of the sixty-five bills for which the Governor later provided his vetoes.  If the adjournment did not prevent the Governor from returning the bills to the Legislature with his veto messages, the bills have become law because the Governor did not return the bills with his objections within ten days.  If the June 30th adjournment of the Legislature did prevent the return of the Governor's objections, the bills have not

---

[3]  Sine die, the Latin term for "without day" has become a part of legislative parlance, despite the fact that it is not actually contained in the Maine Constitution.  *See, e.g.*, Legis. Rec. S-2357 (2d Reg. Sess. 2014); *see also* William T. Pound, Nat'l Conference of State Legislatures, *Mason's Manual of Legislative Procedure* § 445 at 295-96 (2010 ed.).  Although Latin scholars pronounce the term "see-nay de-ay," Maine legislators, and those who work with the Legislature, have historically pronounced the term "sigh-neh dye."  We do not opine on the correct pronunciation.

yet become law, and the Governor's objections can be presented to the next more-than-three-day session of the 127th Maine Legislature.[4]

D.      Extension of Legislative Session

[¶18]   Before we address whether the Governor was prevented from returning his objections to the sixty-five bills under the circumstances set out above, however, we first address the alternative argument made by the Governor.[5]

[¶19]  The Governor argues, pursuant to 3 M.R.S. § 2,[6] that the First Regular Session of the 127th Legislature ended by operation of law on June 17, 2015, when the House and the Senate failed to extend the legislative session by the end of that

---

[4] By providing for the return of the Governor's objections at the next more-than-three-day session of the Legislature, the Maine Constitution precludes the operation of a "pocket veto" between sessions. *See* Me. Const. art. IV, pt. 3, § 2; Tinkle, *The Maine State Constitution* 90 (2d ed. 2013). Since the Constitution's amendment in 1973, *see* Const. Res. 1973, ch. 2, *passed in* 1973, a pocket veto has only been possible after the final adjournment of the Second Regular Session of any Legislature, *see* Me. Const. art. IV, pt. 3, § 2. All parties are in agreement on this point.

[5] We appreciate the Governor's candor in reporting that this potential impediment to effective legislative action was not known to the Governor during the critical ten-day period and that the Governor did not originally rely on the extension process in applying the three-day provision of the Constitution.

[6] Title 3 M.R.S. § 2 states:

> The first regular session of the Legislature, after its convening, shall adjourn no later than the 3rd Wednesday in June and the 2nd regular session of the Legislature shall adjourn no later than the 3rd Wednesday in April. The Legislature, in case of emergency, may by a vote of 2/3 of the members of each House present and voting, extend the date for adjournment for the first or 2nd regular session by no more than 5 legislative days, and in case of further emergency, may by a vote of 2/3 of the members of each House present and voting, further extend the date for adjournment by 5 additional legislative days. The times for adjournment for the first and 2nd regular sessions may also be extended for one additional legislative day for the purpose of considering possible objections of the Governor to any bill or resolution presented to him by the Legislature under the Constitution, Article IV, Part Third, Section 2.

day.  *See* Me. Const. art IV, pt. 3, § 1 (authorizing the Legislature to "enact appropriate statutory limits on the length" of its sessions).

[¶20]  If the First Regular Session of the 127th Maine Legislature was adjourned with finality on June 17th, the Governor's vetoes would, pursuant to Me. Const. art. IV, pt. 3, § 2, have to be presented to the next legislative session lasting more than three days.  Thus, the possibility that the Legislature lost its capacity to act on June 18, 2015, without calling a new Special Session, cannot be overlooked in our analysis.

[¶21]  The Maine Constitution does not contain express limitations on the length of legislative sessions.  It does expressly establish the opening date of the First and Second Sessions, and it provides that the Legislature has the authority to "enact appropriate statutory limits on the length" of those sessions.  Me. Const. art. IV, pt. 3, § 1.  Exercising that authority, the Legislature has statutorily allowed itself to extend the legislative session by a total of eleven legislative days—two five-day extensions, and an additional one-day extension "for the purpose of considering possible objections of the Governor to any bill or resolution presented to him by the Legislature under the Constitution."  3 M.R.S. § 2.

[¶22]  The statutorily established adjournment date for the First Regular Session of the 127th Legislature was June 17, 2015.  *See id.* ("The first regular session of the Legislature, after its convening, shall adjourn no later than the 3rd

Wednesday in June . . . .").  The Joint Order on the first motion to extend the legislative session is dated June 17, 2015.  Sen. Advanced Jour. & Calendar, Supp. No. 19, S.P. 549 (127th Legis. June 17, 2015).  Both Houses voted on the motion to extend on June 18, 2015, the day *following* the statutorily set date of adjournment.  *See* Me. Sen., Roll Call No. 288 (127th Legis. June 18, 2015); Me. House, Roll Call No. 296 (127th Legis. June 18, 2015).  Thus, the Governor argues, the vote occurred after the session had already ended by operation of law, potentially invalidating all subsequent legislative action.

[¶23]  For the reasons set out below, it is our opinion that, on the facts presented here, the First Regular Session of the 127th Maine Legislature was not effectively adjourned by the operation of the statutory adjournment date, and the Legislature was not stripped of its ability to act on June 18, 2015.  There are a number of factors that inform our analysis of this issue.

[¶24]  First, and perhaps most importantly, it is affirmatively the role of the Legislature to say when it is in session.  *See* Me. Const. art. IV, pt. 3, § 1; *NLRB v. Canning*, --- U.S. ---, 134 S. Ct. 2550, 2574-75 (2014); *see also* Me. Const. art. III, § 2 (providing for the distribution and exclusivity of powers of the three branches of government); *Sawyer v. Gilmore*, 109 Me. 169, 180, 83 A. 673 (1912); *Opinion of the Justices*, 7 Me. 483, 489-90 (1830).  There was no procedural objection by any member of the Legislature to the extension of the session at the June 18th vote,

12

nor does any legislator now challenge the validity of the extension.[7] To the contrary, both Houses were in substantial agreement about the need to extend the session, the motion was dated June 17th, the members of the House voted to pass the motion in numbers well beyond the two-thirds vote required pursuant to 3 M.R.S. § 2, and the Senate passed the motion unanimously.

[¶25]  Second, neither the Constitution nor the statute expressly requires the Legislature to act to extend the session before midnight on the statutorily established date.  The absence of any such constitutional limitation is critical to the analysis given the Legislature's powers to act on behalf of the people *unless limited* by the Constitution.  *See Sawyer*, 109 Me. at 180, 83 A. 673.  Indeed, the Constitution expressly provides that neither House can adjourn for more than two days without the consent of the other House:

> **Section 12.  Adjournments.**  Neither House shall during the session, without the consent of the other, adjourn for more than 2 days, nor to any other place than that in which the Houses shall be sitting.

Me. Const. art. IV, pt. 3, § 12.  That express constitutional limitation on the power of the Houses to adjourn must be understood to control over any statutorily established adjournment date.  In other words, once the First Regular Session

---

[7]  When questioned at Oral Argument regarding the Governor's contention that the legislative session ended by operation of law on June 17th, counsel for the three Republican Members of the House of Representatives agreed that the Legislature's June 18th vote effectively extended the session.

began, that legislative session could not be adjourned for more than two days without the constitutionally required consent of both Houses.

[¶26] Finally, the Legislature has the exclusive authority to set its own rules of procedure, *see* Me. Const. art. IV, pt. 3, §§ 1, 4, which includes the power to "ratify any action that it had the power to authorize in advance and the ratification dates back to the action that was ratified." William T. Pound, Nat'l Conference of State Legislatures, *Mason's Manual of Legislative Procedure* § 146(6) at 114 (2010 ed.); *see id.* § 443 at 294; Me. Sen. R. 520 (127th Legis. Dec. 3, 2014) ("The rules of parliamentary practice comprised in 'Mason's Manual of Legislative Procedure' or any other standard authority, govern the Senate in all cases in which they are applicable . . . ."); Me. House R. 522 (127th Legis. Dec. 3, 2014) ("Mason's Rules govern the House in all cases in which they are applicable . . . .").

[¶27] On this record, where no affirmative language of the Constitution or statute requires the extension vote to occur at a particular time, where the vote to extend came within twenty-four hours of the statutory adjournment date, where the motion to extend was extant before that adjournment date, and where no member of the Legislature objected to the process used to establish the extension, we conclude that neither the Judicial Branch nor the Executive Branch has the constitutional authority to question the validity of the June 18th extension, and we

14

accept the assertion of the Maine Legislature that the extension was procedurally appropriate.

E.     The Constitution

    1.     Background

[¶28]  We begin our analysis of the specific Questions presented by the Governor by reviewing the process that the Maine Constitution sets out for circumstances in which the Governor objects to a bill that has been passed by both Houses of the Legislature and delivered to him.

[¶29]  During the session, the Governor has three options when a bill is presented to him: (1) he can sign the bill into law; (2) he can withhold his signature, which, after ten days, has "the same force and effect as if the Governor had signed it"; or (3) he can object to the bill and send the bill and his objections back to the Legislature within ten days.  Me. Const. art. IV, pt. 3, § 2.  The latter process has come to be called a "veto."

[¶30]  A gubernatorial veto requires both Houses to "reconsider" the bill.  Me. Const. art. IV, pt. 3, § 2.  Only if, by a two-thirds vote of both the House and the Senate, the Legislature votes to approve the bill notwithstanding the objections of the Governor does the bill become law "as if it had been signed by the Governor."  Me. Const. art. IV, pt. 3, § 2.

[¶31] The procedure for a gubernatorial veto during the legislative session is a long-familiar process in Maine government, and there is no dispute that, during the session, the Governor has ten days to present his objection—his veto—to any bill presented to him. That process has been in place since the Maine Constitution took effect in 1820, although the time for the Governor's vetoes has been extended to ten days from its original five days. *See* Me. Const. art. IV, pt. 3, § 2 (1820); Const. Res. 1976, ch. 6, *passed in* 1976.

[¶32] The circumstances creating the Questions before us today arise when a bill that has been passed in both Houses is presented to the Governor at or near the end of a legislative session, calling into question the ordinary ten-day period for the Governor's action. If the Houses present a bill to the Governor but "by their adjournment prevent [the] return" of the bill with the Governor's veto, the Constitution provides the process by which that objection is to be addressed. *See* Me. Const. art. IV, pt. 3, § 2. Between sessions, the process requires the Governor to present his objection "within 3 days after the next meeting of the same Legislature which enacted the bill or resolution." Me. Const. art. IV, pt. 3, § 2. Following the final adjournment of the Second Regular Session, the Constitution dictates that bills not signed by the Governor under those circumstances do not become law. Me. Const. art. IV, pt. 3, § 2. This is commonly known as a "pocket veto." *See, e.g.*, Tinkle, *The Maine State Constitution* 90 (2d ed. 2013).

16

[¶33]   Thus, the question we address today is whether the Legislature by its June 30, 2015, adjournment *prevented* the return of the Governor's objections.

> If the bill or resolution shall not be returned by the Governor within 10 days (Sundays excepted) after it shall have been presented to the Governor, it shall have the same force and effect as if the Governor had signed it *unless the Legislature by their adjournment prevent its return*, in which case it shall have such force and effect, unless returned within 3 days after the next meeting of the same Legislature which enacted the bill or resolution; if there is no such next meeting of the Legislature which enacted the bill or resolution, the bill or resolution shall not be a law.

Me. Const. art. IV, pt. 3, § 2 (emphasis added).[8]

[¶34]   As noted, the Governor and the Legislature offer differing definitions of an adjournment that "prevents" a bill's return with the Governor's objections. The Legislature asserts that the only adjournment that meets that definition is an adjournment without day,[9] although the constitutional provision at issue does not use that term and the framers of the Constitution knew how to indicate adjournment without day.  *See* Me. Const. art. IV, pt. 3, § 20 (stating that "'recess of the Legislature' means the adjournment without day of a session of the

---

[8]   Article IV, part 3, section 2 of the Maine Constitution has been amended three times since it originally took effect in 1820.  For purposes of this opinion, the amendments do not affect our analysis unless otherwise noted, and all references to this provision are to its current version.

[9]   The parties agree that an adjournment without day—adjournment sine die—does trigger the Governor's authority to return the bills on the next occasion on which the same Legislature is continuously in session for more than three days. *See Opinion of the Justices*, 437 A.2d 597, 604-05 (Me. 1981).  The question presented here is whether that is the *only* form of adjournment that has that effect.

Legislature").[10] The Governor asserts that it is not the form of the adjournment but the effect of the adjournment that controls. On the facts before us, the Governor argues that, because the adjournment came at the temporal end of the session, did not include a date certain for return, and did not result in a return of the Legislature immediately after the ten days allotted for gubernatorial veto, the effect was an adjournment that triggered his authority to hold his vetoes until the next more-than-three-day legislative session.

2. Constitutional Interpretation

[¶35] Because the same principles employed in the construction of statutory language hold true in the construction of a constitutional provision, we first examine the plain language of the provision. *Allen v. Quinn*, 459 A.2d 1098, 1100 (Me. 1983) (stating that "'we look primarily to the language used'" in interpreting the Maine Constitution (quoting *Farris ex rel. Dorsky v. Goss*, 143 Me. 227, 230, 60 A.2d 908 (1948))). We have agreed with the New York Court of Appeals in addressing the construction of our own Constitution: "'It is the approval of the People of the State which gives force to a provision of the Constitution . . . and in construing the Constitution we seek the meaning which the words would convey to

---

[10] Article IV, pt. 3, § 20 of the Maine Constitution, by its terms, is limited in application to the timing of a people's veto initiative.

18

an intelligent, careful voter.'" *Id.* (quoting *Kuhn v. Curran*, 61 N.E.2d 513, 517-18 (N.Y. 1945)).

[¶36] The Maine Constitution does not use the term "adjournment sine die," nor does it define or explain the terms "adjournment" or "adjournment without day." The only constitutional reference to "adjournment without day" is within article IV, part 3, section 20, which sets out the procedures for an entirely different process—a people's veto. *See* Me. Const. art. IV, pt. 3, §§ 17-20.

[¶37] In other provisions, the term "recess" is used synonymously with "adjournment sine die." *See* Me. Const. art. IV, pt. 3, § 16 (providing that Acts of the Legislature take effect ninety days after the "recess of the session").

[¶38] In contrast to the use of the terms in the foregoing provisions, the Constitution also uses the term "adjourn" or "adjournment" in other contexts where the meaning may include a brief or temporary hiatus of legislative business. *See, e.g.*, Me. Const. art. IV, pt. 3, §§ 3, 12.

[¶39] Thus, the constitutional provision at issue is ambiguous. The phrase "by their adjournment prevent its return" has not been clarified within the Maine Constitution or by our past opinions. When a provision is ambiguous, as is the case here, we must "determine the meaning by examining the purpose and history surrounding the provision." *Voorhees v. Sagadahoc Cty.*, 2006 ME 79, ¶ 6, 900 A.2d 733 (citing *Morris v. Goss*, 147 Me. 89, 108-09, 83 A.2d 556 (1951)). In

construing the Maine Constitution, we address context, historical origins, tradition, and precedent.

[¶40] Context is critically important:

> One part [of the Constitution] may qualify another so as to restrict its operation, or apply it otherwise than the natural construction would require if it stood by itself; but one part is not to be allowed to defeat another if by any reasonable construction the two can be made to stand together.

1 Thomas M. Cooley & Walter Carrington, *Cooley's Constitutional Limitations* 129 (8th ed. 1927). Also critical to our analysis of the ambiguous phrase are the traditions of Maine government and its long-practiced actions interpreting the constitutional provisions at issue. "[W]henever a constitutional provision may be considered ambiguous its . . . 'interpretation must be held to be settled by the contemporaneous construction, and the long course of practice in accordance therewith.'" *Opinion of the Justices*, 146 Me. 316, 323, 80 A.2d 866 (1951) (quoting *State v. Longley*, 119 Me. 535, 540, 112 A. 260 (1921)). Finally, we may look to the interpretation of constitutional provisions undertaken by other courts when the constitutional language at issue is similar or drawn from similar historical passages. *See Opinion of the Justices*, 175 A.2d 405, 407 (Del. 1961).

[¶41] Because context, long-practiced traditions and interpretations, and judicial analysis and precedent in other jurisdictions interpreting similar

20

constitutional provisions all play a part in our interpretation of the constitutional provision at issue here, we address them each in turn.

a.    Context

[¶42]   Any assessment of executive and legislative authority must be understood in the context of Maine's constitutional and historical recognition of the separation of powers among the three branches of government as set out in article III of the Maine Constitution.

> **Section 1.  Powers distributed.**  The powers of this government shall be divided into 3 distinct departments, the legislative, executive and judicial.
>
> **Section 2.  To be kept separate.**  No person or persons, belonging to one of these departments, shall exercise any of the powers properly belonging to either of the others, except in the cases herein expressly directed or permitted.

Me. Const. art. III.

[¶43]   The effectuation of these provisions is paramount.  More than one hundred years ago, we noted that the power of the Legislature to act on behalf of the people is addressed in broad terms, subject only to the limitations established by the Constitution.

> It is but the restatement of a fundamental and familiar principle to say that the sovereign power is lodged in the people and that the Constitution, framed and adopted by the people, divides the powers of government into three distinct and yet coordinate departments, executive, judicial and legislative.  But it is not always borne in mind that the Constitution operates differently with respect to these different

21

branches. The authority of the executive and judicial departments is a grant. These departments can exercise only the powers enumerated in and conferred upon them by the Constitution and such as are necessarily implied therefrom. *The powers of the Legislature in matters of legislation, broadly speaking are absolute, except as restricted and limited by the Constitution. As to the executive, and judiciary, the Constitution measures the extent of their authority, as to the Legislature it measures the limitations on its authority.*

*Sawyer*, 109 Me. at 180, 83 A. 673 (emphasis added).

[¶44] In furtherance of the fundamental powers and authority of the separate branches, the Maine Constitution must be read to support the exercise of the applicable powers of each branch. It follows that the Governor's authority to object to legislation, to communicate those objections to the Legislature, and to require the Legislature to consider and act upon those objections must not be limited or infringed upon. In counterbalance, because the Executive is not endowed in American democracy with absolute veto power, the Legislature must be able to anticipate and act upon the Governor's objections and, where it determines it appropriate, override those objections.[11]

---

[11] The Supreme Court of the United States has stated,

The decision to provide the President with a limited and qualified power to nullify proposed legislation by veto was based on the profound conviction of the Framers that the powers conferred on Congress were the powers to be most carefully circumscribed. It is beyond doubt that lawmaking was a power to be shared by both Houses and the President.

*Immigration & Naturalization Serv. v. Chadha*, 462 U.S. 919, 947 (1983); *see also* The Federalist No. 73 (Alexander Hamilton).

[¶45]   It is in this constitutional context that we address the Questions presented.

>   b.   Long-Practiced Traditions and Historical Interpretations

[¶46]   In considering the effect of the June 30th adjournment on the Governor's authority and responsibility in returning the end-of-session bills, we must look to the past.  History demonstrates that Maine Governors, for nearly forty years, have routinely returned bills with their vetoes during temporary absences of the Legislature that came at the end of the session—after an "adjournment" but before the Legislature adjourned sine die.  The Legislature, in turn, routinely addressed those vetoes and either overrode or sustained the governors' objections before finally adjourning the legislative session sine die.

[¶47]   Because of the importance of practical construction in the constitutional analysis, we provide a recitation of these practices throughout the last four decades.  Beginning in the late 1970s, governors have routinely returned vetoes during temporary adjournments of the Legislature, and the Legislature has reconvened to address objections to bills.  For example:

- On July 11, 1977, the 108th Legislature adjourned until July 25th. 2 Legis. Rec. S-2432 (1st Reg. Sess. 1977); 2 Legis. Rec. H-2404 (1st Reg. Sess. 1977).  In the intervening weeks, Governor James B. Longley returned numerous bills with his objections to the House and Senate, respectively.  2 Legis. Rec. S-2459-2486 (1st Reg. Sess. 1977); 2 Legis. Rec. H-2433-2454 (1st Reg. Sess. 1977).  When the Legislature reconvened on July 25, 1977, it considered the Governor's

vetoes, sustained some of the Governor's objections while overriding others, and then adjourned sine die. 2 Legis. Rec. S-2459-2486, 2488 (1st Reg. Sess. 1977); 2 Legis. Rec. H-2433-2456, 2458 (1st Reg. Sess. 1977).

- On June 12, 1981, the 110th Legislature adjourned until June 19th. 2 Legis. Rec. S-1660 (1st Reg. Sess. 1981); 2 Legis. Rec. H-1658 (1st Reg. Sess. 1981). Although the Legislature was not adjourned for longer than ten days, Governor Joseph E. Brennan returned one bill with his objections on June 19th, and the Legislature addressed the Governor's objections the same day. 2 Legis. Rec. S-1682-1685 (1st Reg. Sess. 1981); 2 Legis. Rec. H-1662-1669 (1st Reg. Sess. 1981). Both the House and the Senate overrode the Governor's veto, 2 Legis. Rec. H-1669 (1st Reg. Sess. 1981); 2 Legis. Rec. S-1685 (1st Reg. Sess. 1981), before adjourning sine die, 2 Legis. Rec. S-1686 (1st Reg. Sess. 1981); 2 Legis. Rec. H-1671 (1st Reg. Sess. 1981).

[¶48] The same practice was evident during Governor McKernan's administrations. On one occasion, Governor McKernan returned his objections to bills after the Legislature had adjourned until a date certain, and on another occasion, Governor McKernan returned vetoed bills after the Legislature adjourned "to the call" of legislative leadership twenty-nine days after the interim adjournment:

- On October 21, 1987, during a Second Special Session, the 113th Legislature adjourned "to the call of the President of the Senate and the Speaker of the House when there is a need to conduct legislative business." 3 Legis. Rec. S-6 (2d Spec. Sess. 1987); 3 Legis. Rec. H-4 (2d Spec. Sess. 1987). On October 22, 1987, Governor McKernan returned two bills with his vetoes—one to the House of Representatives and one to the Senate. 3 Legis. Rec. S-44 (2d Spec. Sess. 1987); 3 Legis. Rec. H-7-8 (2d Spec. Sess. 1987). The Legislature reconvened on November 19, 1987, to address the Governor's objections, 3 Legis. Rec. S-44-45, 61 (2d Spec. Sess.

24

1987); 3 Legis. Rec. H-7-8 (2d Spec. Sess. 1987), before adjourning the Second Special Session sine die on November 20, 1987, 3 Legis. Rec. S-82 (2d Spec. Sess. 1987); 3 Legis. Rec. H-75 (2d Spec. Sess. 1987)

- On July 1, 1993, the 116th Legislature adjourned until July 14, 1993. 4 Legis. Rec. S-1274 (1st Reg. Sess. 1993); 2 Legis. Rec. H-1435 (1st Reg. Sess. 1993). Notably, Governor McKernan actually entered the Hall of the House of Representatives before it adjourned and said, "I hope that we will be able to keep the session on the 14th of July on veto day at least fairly short." 2 Legis. Rec. H-1435 (1st Reg. Sess. 1993). Thereafter, Governor McKernan returned two bills to the House of Representatives on July 13th. 2 Legis. Rec. H-1437 (1st Reg. Sess. 1993). After the Legislature reconvened on July 14th, it sustained the Governor's vetoes before adjourning sine die. 4 Legis. Rec. S-1279 (1st Reg. Sess. 1993); 2 Legis. Rec. H-1443, 1449, 1450 (1st Reg. Sess. 1993).

[¶49] Examples of a similar process can be found during Governor King's terms in office.[12] In at least one instance, the Legislature adjourned until a date certain to address vetoes. On two occasions, the Legislature adjourned "until the call," returning within several weeks to address Governor King's objections. Again, several Legislatures adjourned for more than ten days before reconvening to address objections of the Governor:

- In 1997, the 118th Legislature adjourned on June 1st "until the call of the President of the Senate and the Speaker of the House, respectively, when there is a need to conduct legislative business." 2 Legis. Rec. S-1426 (1st Spec. Sess. 1997); *see* 2 Legis. Rec. H-1362 (1st Spec. Sess. 1997). On June 2; 10; and 11, 1997, Governor King returned

---

[12] Although the record reflects that Governor John E. Baldacci made use of the three-day process following an adjournment sine die of the First Special Session of the 122nd Legislature, *see* 2 Legis. Rec. H-1141 (2d Reg. Sess. 2006), we did not find any similar "veto-day" practice occurring before adjournment sine die during his administrations.

three bills to the House with his vetoes, all of which were sustained nineteen days after adjournment, when the Legislature returned for veto day on June 20, 1997. 2 Legis. Rec. H-1367-1369 (1st Spec. Sess. 1997). Thereafter, the Legislature adjourned sine die. 2 Legis. Rec. S-1457 (1st Spec. Sess. 1997); 2 Legis. Rec. H-1394 (1st Spec. Sess. 1997).

- On April 28, 2000, the 119th Legislature adjourned "until the call of the Speaker of the House, when there is a need to conduct business." 3 Legis. Rec. H-2700 (2d Reg. Sess. 2000); *see* 4 Legis. Rec. S-2476 (2d Reg. Sess. 2000). On May 8, 2000, Governor King returned bills to both the House and Senate, voicing his objections. 4 Legis. Rec. S-2484-2485, 2503-2504 (2d Reg. Sess. 2000); 3 Legis. Rec. H-2706-2710 (2d Reg. Sess. 2000). After reconvening thirteen days after adjourning, on May 11, 2000, and considering the Governor's objections, 4 Legis. Rec. S-2485, 2504-2506 (2d Reg. Sess. 2000); 3 Legis. Rec. H-2707-2712 (2d Reg. Sess. 2000), the Legislature then adjourned sine die on May 12, 2000, 4 Legis. Rec. S-2530 (2d Reg. Sess. 2000); 3 Legis. Rec. H-2753 (2d Reg. Sess. 2000).

- On April 10, 2002, the 120th Legislature adjourned until April 24, 2002. 3 Legis. Rec. S-2074 (2d Reg. Sess. 2002); 3 Legis. Rec. H-2244 (2d Reg. Sess. 2002). On April 11th, Governor King returned three bills to the House with his vetoes and on April 17th, the Governor returned one bill to the Senate with his veto. 3 Legis. Rec. S-2080-2081 (2d Reg. Sess. 2002); 3 Legis. Rec. H-2249-2261 (2d Reg. Sess. 2002). After considering the Governor's objections when it reconvened fourteen days after adjournment, on April 24th, the Legislature adjourned sine die on April 25, 2002. 3 Legis. Rec. S-2080-2084, 2115 (2d Reg. Sess. 2002); 3 Legis. Rec. H-2249-2261, 2291 (2d Reg. Sess. 2002).

[¶50] More currently, during Governor LePage's tenure in office, veto override sessions have occurred after adjournment to a date certain and before adjournment sine die:

26

- On June 16, 2011, the 125th Legislature adjourned until June 28, 2011.  2 Legis. Rec. S-1423 (1st Reg. Sess. 2011); 2 Legis. Rec. H-1019 (1st Reg. Sess. 2011).  On June 17th, 20th, and 23rd, Governor LePage returned eight bills to their Houses of origin. 3 Legis. Rec. S-1424-1426 (1st Reg. Sess. 2011); 2 Legis. Rec. H-1040-1045 (1st Reg. Sess. 2011).  The Legislature reconvened on June 28th to consider the Governor's vetoes before adjourning sine die on June 29, 2011.  3 Legis. Rec. S-1424-1426, 1442-1444, 1494 (1st Reg. Sess. 2011); 2 Legis. Rec. H-1040-1045, 1067 (1st Reg. Sess. 2011).

- On June 27, 2013, the 126th Legislature adjourned until July 9, 2013. Legis. Rec. S-1479 (1st Reg. Sess. 2013); Legis. Rec. H-1210 (1st Reg. Sess. 2013).  On June 28; July 2; July 8; and July 9, 2013, while the Legislature was adjourned, Governor LePage returned bills with his objections.  Legis. Rec. S-1479-1507 (1st Reg. Sess. 2013); Legis. Rec. H-1219-1241 (1st Reg. Sess. 2013).  On July 9, 2013, the Legislature reconvened to address the Governor's objections before adjourning sine die.  Legis. Rec. S-1479-1507, 1525 (1st Reg. Sess. 2013); Legis. Rec. H-1219-1241, 1282 (1st Reg. Sess. 2013).

- On April 18, 2014, the 126th Legislature adjourned until May 1, 2014. Legis. Rec. S-2297 (2d Reg. Sess. 2014); Legis. Rec. H-2008 (2d Reg. Sess. 2014).  In the intervening weeks, Governor LePage vetoed numerous bills and returned the same to their respective Houses of origin.  Legis. Rec. S-2302-2315, 2326-2341, 2343-2347 (2d Reg. Sess. 2014); Legis. Rec. H-2010-2041 (2d Reg. Sess. 2014).  When the Legislature reconvened on May 1, 2014, it considered the Governor's vetoes, had the opportunity to sustain the Governor's objections to certain bills while overriding others, and then finally adjourned sine die on May 2, 2014.  Legis. Rec. S-2298, 2302-2316, 2326-2341, 2343-2347, 2357 (2d Reg. Sess. 2014); Legis. Rec. H-2009-2042, 2059 (2d Reg. Sess. 2014).

[¶51]  All of the legislative veto sessions during Governor LePage's first

term occurred more than ten days after an interim adjournment of the Legislature,

some several days later.  Even when the Legislature did not specify the date of its

return when adjourning near the end of the session, the Governor was not prevented from returning vetoed bills to their Houses of origin. For example:

- On May 17, 2012, the 125th Legislature adjourned "until the call of the President of the Senate and the Speaker of the House, respectively, when there is a need to conduct business." 3 Legis. Rec. H-1589 (2d Reg. Sess. 2012); *see* 4 Legis. Rec. S-2349 (2d Reg. Sess. 2012). On May 25th, Governor LePage vetoed four bills, and on May 29th, the Governor vetoed two bills; the bills were then returned to the Houses where they originated. 4 Legis. Rec. S-2350-2353 (2d Reg. Sess. 2012); 3 Legis. Rec. H-1590-1597 (2d Reg. Sess. 2012). When the Legislature reconvened fourteen days after adjourning, on May 31, 2012, both Houses addressed the Governor's objections—the House sustained three of the four vetoed bills from the Governor, and the Senate voted to override the Governor's veto on two bills—before the Legislature adjourned sine die. 4 Legis. Rec. S-2350-2354, 2357 (2d Reg. Sess. 2012); 3 Legis. Rec. H-1590-1599, 1604 (2d Reg. Sess. 2012).

[¶52] These examples demonstrate that temporary adjournments of the Legislature near the end of a legislative session—whether until a date certain or until the call of the leadership, and whether beyond a ten-day period—have not prevented governors from returning bills with their objections to their Houses of origin within the constitutionally-required ten-day timeframe.

[¶53] This long-settled practice plays a significant role in our interpretation of the provision of the Constitution at issue. *See Opinion of the Justices*, 146 Me. at 323, 80 A.2d 866 (citing *Longley*, 119 Me. at 540, 112 A. 260).

### c. Precedent—Other Jurisdictions

[¶54]    We turn finally to the analysis and interpretations of other jurisdictions.  Because our analysis depends on the specific language of Maine's Constitution and long-settled Maine practice, our review of precedent from other jurisdictions may not carry as much weight as precedent from our own jurisdiction.  It will, however, serve the important purpose of assuring that we have considered all of the available authority on point.

[¶55]    Beginning with federal precedent, we note that article IV, part 3, section 2 of the Maine Constitution very closely mirrors, but is not identical to, the United States Constitution, which provides:

> If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment *prevent its Return*, in which Case it shall not be a Law.

U.S. Const. art. I, § 7, cl. 2 (emphasis added).  The seminal case that interpreted this provision and that the Governor urges us to apply in undertaking our own constitutional analysis is the *Pocket Veto Case*, 279 U.S. 655 (1929).[13]

[¶56]    In the *Pocket Veto Case*, the Supreme Court of the United States interpreted Article I, Section 7 of the United States Constitution to allow a pocket

---

[13]   The docket title of the *Pocket Veto Case* is *The Okanogan, Methow, San Poelis (or San Poil), Nespelem, Colville, and Lake Indian Tribes or Bands of the State of Washington v. United States*, 279 U.S. 655 (1929).

veto when Congress's intrasession adjournment prevented the return of a bill to the House where it originated within ten days. 279 U.S. at 691-92. Because the adjournment at issue in the *Pocket Veto Case* was unquestionably a final adjournment of the First Session of Congress, *id.* at 672, the analysis is not on all fours with the matter before us. Nonetheless, the Supreme Court's language has provided guidance for other courts, and we address it here.

[¶57] The determinative question in the *Pocket Veto Case* was whether the Congressional adjournment was the type of adjournment that "prevents the [Executive] from returning the bill to the House in which it originated within the time allowed." *Id.* at 680 (quotation marks omitted). Because Congress had adjourned finally for the session, the Supreme Court determined "no substantial basis [exists] for the suggestion" that, although Congress is not in session, "the bill may nevertheless be returned . . . by delivering it, with the [Executive's] objections, to an officer or agent of the House, for subsequent delivery . . . when it resumes its sittings at the next session." *Id.* at 683-84.

[¶58] That interpretation of the "prevent" language in the context of an adjournment sine die is consistent with the understanding of all parties before us today. It was the broader language of the Supreme Court's opinion that added to the potential for dispute here. The Court went on to conclude that the return of the vetoes cannot be made to an officer or an agent of the specific House in question,

30

but must "be returned to the 'House' when sitting in an organized capacity for the transaction of business." *Id.* at 683.

[¶59]   Almost ten years after the *Pocket Veto Case*, the Supreme Court retrenched from the breadth of its *Pocket Veto* language, interpreting the same constitutional provision—Article I, Section 7—as preventing the President from exercising the pocket veto when the House had adjourned for a brief mid-session recess.  *See Wright v. United States*, 302 U.S. 583, 594-98 (1938).  In *Wright*, the Court left open the question of whether a pocket veto could occur during a longer intrasession recess, but stated that, in reaching its decision, it sought to promote the "two fundamental purposes" of the pocket veto provision: "(1) that the President shall have suitable opportunity to consider the bills presented to him, and (2) that the Congress shall have suitable opportunity to consider his objections to bills and on such consideration to pass them over his veto provided there are the requisite votes." *Id.* at 596.

[¶60]   Many states have grappled with the interpretation of their own state constitutions and the question of what type of adjournment prevents the return of governors' vetoes.  The great weight of state authority appears to be that only a final adjournment of the Legislature prevents the return of a bill.  *See Wood v. State Admin. Bd.*, 238 N.W. 16, 18 (Mich. 1931); *see also Opinion of the Justices*, 175 A.2d at 407 (collecting cases).

[¶61]  As early as 1791, the Justices of the Massachusetts Supreme Judicial Court issued an opinion answering two questions referred to it by the Massachusetts Senate.  At the time, the Massachusetts Constitution provided that "if any bill or resolve shall not be returned by the governor within five days after it shall have been presented, the same shall have the force of a law."  Mass. Const. pt. II, ch. I, § 1, art. II.  The Senate sought an opinion on what effect a recess of the General Court had on the five-day period in which the Governor was required to act on a bill.  *Opinion of the Justices*, 3 Mass. 567, 567 (1791).  The Justices opined that "[i]f by *recess* . . . [it] is meant a recess after a prorogation,[14] or recess after an adjournment, where there is no subsequent meeting of the same General Court on that adjournment, we are clearly of opinion that such bill or resolve has *not* the force of law."  *Id.*  If the Massachusetts Senate was instead referring to "a recess upon an adjournment," the Justices stated that the period of the adjournment was included in the five days the Governor had to act on the bill because "all the days of the [General] Court's sitting are but *one session*, although an adjournment intervenes. When a prorogation takes place, the session is ended,

---

[14]  Courts and commentators have long distinguished between prorogation and adjournment.  According to William Blackstone, "prorogation puts an end to the session; and then such bills as are only begun and not perfected, must be resumed *de novo* (if at all) in a subsequent session: whereas, after an adjournment, all things continue in the same state as at the time of the adjournment made, and may be proceeded on without any fresh commencement."  1 William Blackstone, Commentaries *186 (emphasis added); *see also Black's Law Dictionary* 1341 (9th ed. 2009) (defining "prorogation" in part as "the discontinuance of a legislative session until its next term").

32

and a bill or resolve, *after the session is ended*, cannot acquire the force of law."

*Id.* at 567-68.

[¶62] In 1821, the Massachusetts Constitution was amended to add a similar

provision to that of article IV, part 3, section 2 of the Maine Constitution:

> If any bill or resolve shall be objected to, and not approved by the
> governor; and if the general court shall adjourn within five days after
> the same shall have been laid before the governor for his approbation,
> and thereby prevent his returning it with his objections, as provided by
> the constitution, such bill or resolve shall not become law, nor have
> force as such.

Mass. Const. amend. art. I.[15] In essence, this provision codified the 1791

Massachusetts *Opinion of the Justices* by clarifying that, if a legislative session

finally ends before the five-day period has expired, then any pending bills will not

become law. *See* Journal of Debates and Proceedings in the Convention of

Delegates, Chosen to Revise the Constitution of Massachusetts (1820) 97 (1853).

[¶63] In 1864, the Justices of the New Hampshire Supreme Court issued an

opinion interpreting a similar provision in the New Hampshire Constitution.

---

[15] The Massachusetts Constitution has since been amended to read:

> And in order to prevent unnecessary delays, if any bill or resolve shall not be returned by the
> governor within ten days after it shall have been presented, the same shall have the force of a
> law. . . . If any bill or resolve shall be objected to, and not approved by the governor, and if
> the general court shall adjourn within ten days after the same shall have been laid before the
> governor for his approbation, and thereby prevent his returning it with his objections, as
> provided by the constitution, such bill or resolve shall not become a law, nor have force as
> such.

Mass. Const. art. XC, §§ 1, 2.

*Opinion of the Justices*, 45 N.H. 607 (1864). The New Hampshire Constitution

states as follows:

> If any bill shall not be returned by the governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it unless the legislature, by their adjournment, *prevent its return*, in which case it shall not be a law.

N.H. Const. pt. 2, art. 44 (emphasis added).[16] The nature of the questions required

the Justices to explain the circumstances under which the Governor would be

prevented from returning a bill due to adjournment. *Opinion of the Justices*,

45 N.H. at 608-11. First, the Justices noted that the bill did not need to be returned

while the Legislature was physically meeting. *See id.* at 609. The Justices stated

that "[t]he duty of the governor is performed when he returns the bill, with his

objections, to the house in which the bill originated, and gives them proper notice,

whether it is received or not." *Id.* Second, because the Legislature need not be

present when the Governor returns the bill, the Justices opined as follows:

> The adjournment referred to in this provision of the constitution is not, we think, the ordinary recess or adjournment from time to time during the continuance of the session, but the final adjournment at the close of the session. In fact, *this is the only adjournment, we think, which could prevent a return of the bill within the time limited*.

---

[16] This provision of New Hampshire's Constitution has not been amended since it took effect in 1792.

34

*Id.* at 610 (emphasis added).[17]

[¶64] Similarly, in 1927, the Minnesota Supreme Court held that where the Minnesota Senate temporarily adjourned from Thursday to Monday, the adjournment did not prevent the return of a bill by the Governor. *State ex rel. Putnam v. Holm*, 215 N.W. 200, 201, 203-04 (Minn. 1927). At the time, the Minnesota Constitution provided as follows:

> If any bill shall not be returned by the governor within three days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the legislature, by adjournment within that time, *prevents its return*, in which case it shall not be a law.

Minn. Const. art. IV, § 11 (emphasis added).[18] The court first noted that "[t]he prevailing rule is that a temporary adjournment of the Legislature, or of the house

---

[17] The Justices of the New Hampshire Supreme Court reasoned in part that, because the individual houses of the Legislature can constitutionally adjourn for days at a time, "[i]t could not have been expected that any such adjournment would or could operate to defeat the return of any bill within the time there specified, that the governor might wish to veto." *Opinion of the Justices*, 45 N.H. 607, 610 (1864). Instead, "[t]he only adjournment that was to prevent the return of the bill, was an adjournment of the *legislature*; that is, of both houses of the general court, and not of either house alone." *Id.* at 610-11 (quotation marks omitted). The Justices concluded that "the intention of the framers of the constitution . . . was, most evidently, . . . that it was only the final adjournment of the legislature, of both houses, for the session that could [prevent the return of a bill]." *Id.* at 611; *see also Opinion of the Justices*, 167 A. 160, 160 (N.H. 1933) (citing to the 1864 New Hampshire *Opinion of the Justices* to answer a question referred to the Justices by the New Hampshire House of Representatives and stating that, in the court's opinion, a bill had become law when the Governor did not return the bill with his objections within the five-day period allowed under the New Hampshire Constitution).

[18] The Minnesota Constitution has since been amended on several occasions and currently reads as follows:

> Any bill not returned by the governor within three days (Sundays excepted) after it is presented to him becomes a law as if he had signed it, unless the legislature by adjournment within that time prevents its return. Any bill passed during the last three days of a session

in which a bill originated, does not prevent the return of the bill." *Putnam*, 215 N.W. at 203. The court then reasoned that the Legislature "is in existence until the final adjournment, regardless of whether" it is actually present. *Id.* Because "[t]he presiding officer, secretary (or clerk) and members of either house are its authorized representatives[,] [t]here is no reason why a return cannot be made to any one of them." *Id.* Similar to the circumstance before us, the Minnesota Supreme Court further noted that the Governor had previously returned bills with his objections "not only when the house has not been in session, but at places other than in the Capitol building." *Id.* The court therefore warned "against a construction that would bring into existence other bills, as valid laws, which have supposedly been put to death." *Id.*

[¶65] In 1931, the Michigan Supreme Court held that

[t]he purpose and object as well as the language of the Constitution justifies and, in our opinion, requires the construction that it is only the adjournment without day of the legislature which prevents return of a bill to the originating house and calls into operation the provision for "pocket veto."

---

may be presented to the governor during the three days following the day of final adjournment and becomes law if the governor signs and deposits it in the office of the secretary of state within 14 days after the adjournment of the legislature. Any bill passed during the last three days of the session which is not signed and deposited within 14 days after adjournment does not become a law.

Minn. Const. art. IV, § 23.

36

*Wood*, 238 N.W. at 20. The provision of the Michigan Constitution interpreted by the court provided as follows:

> If any bill be not returned by the governor within ten days, Sundays excepted, after it has been presented to him, it shall become a law in like manner as if he had signed it, unless the legislature, by adjournment, prevents *its* return, in which case it shall not become a law.

Mich. Const. art. V, § 36.[19] The court found it important that "[t]he weight of State authority seems to be that it is only the final adjournment of the legislature which prevents return of a bill on veto and that a temporary adjournment does not." *Wood*, 238 N.W. at 18. Further, the court declined to extend the reasoning of the *Pocket Veto Case* "because it would introduce into what was designed as a simple, practical, and definitely operating provision for executive disapproval of bills, an element disturbing or destructive of such constitutional power." *Id.* at 19. The court noted that "[i]t is hardly conceivable that the framers of the Constitution

---

[19] The Michigan Constitution has since been amended to clarify that ambiguity by providing as follows:

> Every bill passed by the legislature shall be presented to the governor before it becomes law, and the governor shall have 14 days measured in hours and minutes from the time of presentation in which to consider it. If he approves, he shall within that time sign and file it with the secretary of state and it shall become law. If he does not approve, and the legislature has within that time finally adjourned the session at which the bill was passed, it shall not become law. If he disapproves, and the legislature continues the session at which the bill was passed, he shall return it within such 14-day period with his objections, to the house in which it originated. . . . If any bill is not returned by the governor within such 14-day period, the legislature continuing in session, it shall become law as if he had signed it.

Mich. Const. art. IV, § 33.

could have understood that return of a bill on veto must be to the originating house in session, and, in the face of such understanding, have omitted provision declaring the effect on return of adjournment of such house." *Id.* The court eloquently summarized its conclusions as follows:

> The legislature holds one regular session. Each house is organized for the session. Temporary adjournments do not disrupt or interrupt the legislature or an organized house. Each constitutes a constitutional entity throughout the session. So, the governor may transmit the bill to the originating house through its officers and thus unequivocally evidence his disapproval. As temporary adjournment provides for further session of the legislature, its jurisdiction to pass the bill over his veto is retained.

*Id.* at 20.

[¶66] Many other state courts have similarly interpreted their respective state constitutions. *See, e.g.*, *Harpending v. Haight*, 39 Cal. 189, 206 (1870) (holding that "no other adjournment than the final adjournment of the Legislature itself at the end of the session . . . prevent[s] the return of a bill by the Executive with his objections to its passage"); *State ex rel. State Pharm. Ass'n v. Michel*, 27 So. 565, 567 (La. 1900) (stating that "adjournment" "means final adjournment at the close of the session" and that the Legislature need not be present for the Governor to return a bill with his objections); *Miller v. Hurford*, 9 N.W. 477, 479 (Neb. 1881) (stating that a similar provision "appl[ies] to adjournments *sine die*, and not to adjournments from time to time"); *Hequembourg v. Dunkirk*, 2 N.Y.S.

38

447, 450 (Gen. Term 1888) (adopting New Hampshire's interpretation of "adjournment"); *Corwin v. Comptroller Gen.*, 6 S.C. 390, 395-98 (1875) (interpreting a constitutional provision nearly identical to Maine's and holding that the House's temporary adjournment did not prevent the Governor's return of a bill); *Johnson City v. Tenn. E. Elec. Co.*, 182 S.W. 587, 590 (Tenn. 1915) (holding that, where a bill's "return was not prevented by final adjournment of the assembly[,] . . . the bill became a law at the expiration of the time limited, and its subsequent return by the governor to the house, and any action on it taken by the house must be regarded as nullities"); *State ex rel. Sullivan v. Dammann*, 267 N.W. 433, 437 (Wis. 1936) ("It is our conclusion that the word 'adjournment' means *sine die* adjournment of the legislature, and that such an adjournment is the only one that prevents the return of a bill.").[20]

[¶67]  To be sure, contrary to the prevailing view that "adjournment" means only a final adjournment of the Legislature, a handful of states have taken the approach that even a temporary adjournment prevents the return of a bill.  In 1863, the Illinois Supreme Court stated that "[i]t is manifest . . . that the general assembly

---

[20]  In 1911, the Supreme Court of Alabama also held that adjournment within its constitution meant "final adjournment."  *State ex rel. Crenshaw v. Joseph*, 57 So. 942, 944 (Ala. 1911).  However, the Alabama Constitution explicitly provided for circumstances both where the Legislature adjourned and took a recess.  *See* Ala. Const. art. V, § 125 ("[U]nless the legislature, by its adjournment, prevent the return, in which case it shall not be a law; but when return is prevented by recess, such bill must be returned to the house in which it originated within two days after reassembling, otherwise it shall become a law . . . .").  This provision has not since been amended or repealed.

must be in an organized condition, acting as a general assembly at the end of [the period within which the governor may return a bill], if not during the whole time, to require the governor to perform the act." *People ex. rel. Harless v. Hatch*, 33 Ill. 9, 135 (1863). At the time, the Illinois Constitution provided as follows:

> If any bill shall not be returned by the governor within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law, in like manner as if he had signed it, unless the general assembly shall, by their adjournment, prevent its return, in which case the said bill shall be returned on the first day of the meeting of the general assembly, after the expiration of said ten days, or be a law.

Ill. Const. of 1848, art. IV, § 21.[21] The court reasoned that the "mode best calculated to promote the general welfare" and "to prevent the evils of hasty, illy considered legislation" was to "arrest the passage of a bill until [the Governor's] objections could be heard." *Harless*, 33 Ill. at 136.

[¶68] In 1904, the Connecticut Supreme Court of Errors held that an adjournment of the House in which a bill originated for more than three calendar days after its presentation to the Governor prevents the return of the bill. *State ex*

---

[21] The Illinois Constitution now provides:

> If *recess or adjournment* of the General Assembly prevents the return of a bill, the bill and the Governor's objections shall be filed with the Secretary of State within such 60 calendar days. The Secretary of State shall return the bill and objections to the originating house promptly upon the next meeting of the same General Assembly at which the bill can be considered.

Ill. Const. art. IV, § 9, subsec. b (emphasis added).

40

*rel. Norwalk v. South Norwalk*, 58 A. 759, 760 (Conn. 1904). The Connecticut Constitution provided:

> If the bill shall not be returned by the governor within three days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it; unless the general assembly, by their adjournment, prevents its return, in which case it shall not be a law.

Conn. Const. of 1818, art. IV, § 12.[22] Important to that court's analysis was the long-practiced tradition of delivery of the Governor's return to an *active* session of the Legislature; it relied on a practice by which, over a period of eighty-five years, "since the creation of the office of executive secretary in 1819 the invariable practice, in returning a bill, has been to return it by his hand for delivery in open house to the proper officer." *Norwalk*, 58 A. at 760.

[¶69] In 1912, the Supreme Court of New Jersey held that a bill was invalid when the House where the bill had originated adjourned for more than five days, thereby preventing the Governor from returning the bill. *In re "An Act to Amend*

---

[22] The current Connecticut Constitution was adopted in 1965 and provides:

> In case the governor shall not transmit the bill to the secretary, either with his approval or with his objections, within five calendar days, Sundays and legal holidays excepted, after the same shall have been presented to him, it shall be a law at the expiration of that period; except that, *if the general assembly shall then have adjourned any regular or special session,* the bill shall be a law unless the governor shall, within fifteen calendar days after the same has been presented to him, transmit it to the secretary with his objections, in which case it shall not be a law unless such bill is reconsidered and repassed by the general assembly by at least a two-thirds vote of the members of each house of the general assembly at the time of its reconvening.

Conn. Const. art. IV, § 15 (emphasis added).

*an Act Entitled 'An Act Concerning Pub. Utils.'"* (*Public Utils. Act Case*), 84 A.

706, 710-11 (N.J. 1912). At the time, the New Jersey Constitution provided as

follows:

> If any bill shall not be returned by the governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the legislature, by their adjournment, prevent its return, in which case it shall not be a law.

N.J. Const. of 1844, art. V, § 7.[23] The court reasoned that "the provision itself not

only contemplates, but provides, the effect of an adjournment by the Legislature

for a period sufficiently long to prevent the Governor returning a bill within the

constitutional time." *Public Utils. Act Case*, 84 A. at 710. The court further stated

that a contrary interpretation would "disregard[] the express language of the

constitutional provision, which is that the Governor 'shall return it[,] with his

objections[,] to *the house* in which it shall have originated.'" *Id.* (quoting N.J.

Const. of 1844, art. V, § 7). This case has been criticized in other state court

decisions, however, for ignoring the prevailing rule and failing to mention or

distinguish contrary decisions of other state courts. *See, e.g.*, *Putnam*, 215 N.W. at

203 ("The New Jersey case is not now, nor at the time it was written, in accord

---

[23] New Jersey adopted a new constitution in 1947, which now provides a very specific and detailed roadmap for the return of the bills from the Governor. N.J. Const. art. V, § 1, para. 14.

42

with the prevailing rule.  It does not mention the several prior contrary decisions of other courts.”).

[¶70]  In 1961, the Justices of the Delaware Supreme Court issued an opinion answering questions referred to them by the Governor of Delaware involving the interpretation of a similar provision in Delaware’s Constitution. *Opinion of the Justices*, 175 A.2d 405, 406 (Del. 1961).  The Delaware Constitution then provided as follows:

> If any bill shall not be returned by the Governor within ten days, Sundays excepted, after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the General Assembly shall, by adjournment, prevent its return, in which case it shall not become a law without the approval of the Governor.  No bill shall become a law after the final adjournment of the General Assembly, unless approved by the Governor within thirty days after such adjournment.

Del. Const. art. III, § 18.  The Justices, after recognizing the majority view held by state courts that temporary adjournments do not prevent the return of a bill, opined that the “more persuasive” view, “having regard to the provisions of our own Constitution . . . [is] that a temporary adjournment does prevent the return of a bill.”  *Opinion of the Justices*, 175 A.2d at 407.  The court gave considerable weight to the fact that (1) the Delaware Constitution distinguished between “adjournment” and “final adjournment” within the same constitutional provision; (2) Delaware’s only judicial precedent, in dictum, supported its opinion; and

(3) "meager" but "suggestive" evidence of a practical construction supported its view. *Id.* at 408.[24]

[¶71]   In sum, a majority of the state courts that have interpreted similar constitutional provisions have concluded that only a final adjournment at the end of a session of the Legislature, rather than a temporary adjournment, will prevent the return of a bill with the Governor's objections.  Although some state courts have reached the opposite conclusion, their opinions have generally been based on the unique language of each state's constitution and legislative practice,[25] rather than considerations that can easily be transferred to an analysis of the Maine Constitution.  Thus, overall, our analysis of the opinions of other state courts supports the proposition that the only type of adjournment that prevents the return of a bill by the Governor for the purposes of article IV, part 3, section 2 of the

---

[24]   The Delaware Constitution has since been amended to provide that the General Assembly is continuously in session until its final adjournment:

> If any bill shall not be returned by the Governor within ten days, Sundays excepted, after it shall have been presented to him or her, the same shall be a law in like manner as if he or she had signed it, unless the General Assembly shall, by *final adjournment*, prevent its return, in which case it shall not become a law without the approval of the Governor.

Del. Const. art. III, § 18 (emphasis added); *see also Opinion of the Justices*, 405 A.2d 694, 697 n.6 (Del. 1979) (stating that the amendment was "evidently in response to the 1961 Delaware *Opinion of the Justices*").

[25]   For example, recently, the Supreme Court of Pennsylvania affirmed a decision of the Commonwealth Court of Pennsylvania that the Governor had successfully vetoed a bill when he was physically prevented from returning the bill, with his objections, to the bill's House of origin when the House was actually closed. *Jubelirer v. Pa. Dep't of State*, 871 A.2d 789, 789 (Pa. 2005), *aff'g* 859 A.2d 874 (Pa. Commw. Ct. 2004).

44

Maine Constitution is final adjournment of the Legislature at the end of a legislative session, ordinarily in the form of an adjournment sine die.

## II. CONCLUSIONS

[¶72] Because democracy thrives on discussion and debate, and mankind has not yet found a method of communication that eliminates all potential for misperception or misunderstanding, the process of doing the people's business will occasionally involve contention, confusion, or miscommunication. It follows that clarity of process and adherence to settled expectations are critical to assuring that the procedures of democracy do not devolve into uncertainty. We understand the hope expressed by the three Republican Members of the House that a method of compromise could be found by which the Chief Executive and the Legislature would have an opportunity to revisit decisions and timeframes that have already passed. The Maine Constitution, and nearly four decades of practice and precedent, do not, however, provide for such a process. We have been asked for our opinions regarding the language of the Maine Constitution, and we have endeavored faithfully to provide those opinions.

[¶73] In so doing, we are acutely aware that our conclusions will render ineffective the Governor's objections to sixty-five bills—a result that we do not take lightly. Nonetheless, in exercising the authority of the Judicial Branch to respond to an inquiry from the Executive Branch, we are guided by the need for

certainty in, and confirmation of, the constitutionally-identified process that has been employed in Maine for so many years.

[¶74] In the end, we interpret the Maine Constitution cognizant of the "two fundamental purposes" elucidated in *Wright*: "(1) that the [Governor] shall have suitable opportunity to consider the bills presented to him, and (2) that the [Legislature] shall have suitable opportunity to consider his objections to bills and on such consideration to pass them over his veto provided there are the requisite votes." 302 U.S. at 596.

## III. ANSWERS

[¶75] Our unanimous Opinion is as follows: A solemn occasion has been presented. The constitutional language at issue is ambiguous. The Questions presented by the Governor require reference to context, governmental tradition and practice, and judicial precedent. Having considered the filings, the factual background and legislative record, the constitutional context of the language at issue, long-held traditions and practices of Maine Governors and Legislatures, and the analysis and precedents of other jurisdictions, each of us is of the opinion that a temporary legislative adjournment does not prevent the return of the bills with the Governor's objections to the Legislature. During such a temporary adjournment, the Governor may return the bills and his objections to the officers and agents of the originating House.

46

[¶76]  In the matter at hand, the adjournment of the First Regular Session of the 127th Legislature on June 30, 2015, "until the call" of legislative leadership, for the purpose of addressing the "possible objections of the Governor," did not "prevent" the return of the Governor's objections as described by the Maine Constitution in article IV, part 3, section 2.

[¶77]  Accordingly, for the reasons set forth above, with respect, we answer the Governor's Questions as follows:

1)  What form of adjournment prevents the return of a bill to the Legislature as contemplated by the use of the word, adjournment, in Art. IV, pt. 3, §2 of the Maine Constitution?

    An adjournment sine die does "prevent" the return.  A temporary adjournment to a date certain or "at the call" of legislative leadership does not prevent the return.  We do not, however, attempt to address the entire universe of adjournments that may prevent the return of the Governor's objections, such as an adjournment caused by an unanticipated *force majeure*.[26]

2)  Did any of the action or inaction by the Legislature trigger the constitutional three-day procedure for the exercise of the Governor's veto?

    No.

3)  Are the 65 bills I returned to the Legislature on July 16 properly before that body for reconsideration?

    No.  Following the ten days provided for gubernatorial objection, the bills that were not returned to the House of origination with the

---

[26]  A "*force majeure*" is an unanticipated and uncontrollable event, including an act of nature such as a flood, tornado, or hurricane.  *See Black's Law Dictionary* 718 (9th ed. 2009)

Governor's objections became law, to be effective ninety days after the adjournment sine die of the First Regular Session of the 127th Legislature, except where enacted as emergency legislation.

Signed: August 6, 2015

Each Justice Individually Opining. For the Justices,

_____/s/_____

LEIGH I. SAUFLEY
Chief Justice

DONALD G. ALEXANDER
ANDREW M. MEAD
ELLEN A. GORMAN
JOSEPH M. JABAR
THOMAS E. HUMPHREY
Associate Justices

48

**On the briefs:**

Cynthia Montgomery, Esq., Hancock Fenton, Esq., Holly Lusk, Esq., and Avery Day, Esq., Office of the Governor, Augusta, for Governor Paul R. LePage

Timothy C. Woodcock, Esq., and Adria Y. LaRose, Esq., Eaton Peabody, Bangor, for President of the Maine Senate Michael Thibodeau on behalf of the Maine Senate and Speaker of the House of Representatives Mark Eves on behalf of the House of Representatives

Janet T. Mills, Attorney General, Susan P. Herman, Dep. Atty. Gen., and Phyllis Gardiner, Asst. Atty. Gen., Office of the Attorney General, Augusta, for Attorney General Janet T. Mills

L. Clinton Boothby, Esq., Boothby Perry, LLC, Turner, for Representatives Kenneth W. Fredette, Eleanor M. Espling, and Jeffrey L. Timberlake

Zachary L. Heiden, Esq., Alison Beyea, Esq., and Oamshri Amarasingham, Esq., ACLU of Maine Foundation, Portland, for American Civil Liberties Union of Maine Foundation

Melissa A. Hewey, Esq., and David M. Kallin, Esq., Drummond Woodsum & MacMahon, Portland, for Planned Parenthood of Northern New England, Maine Family Planning, Mabel Wadsworth Women's Health Center, Maine Primary Care Association, and Maine Nurse Practitioner Association

Lise McLain of Gilead and Dorothy Lafortune of Biddeford

Audrey Spence of Portland

**At oral argument:**

Cynthia Montgomery, Esq., for Governor Paul R. LePage

L. Clinton Boothby, Esq., for Representatives Kenneth W. Fredette, Eleanor M. Espling, and Jeffrey L. Timberlake

Timothy C. Woodcock, Esq., for President of the Maine Senate Michael Thibodeau on behalf of the Maine Senate and Speaker of the House of Representatives Mark Eves on behalf of the House of Representatives

Phyllis Gardiner, Asst. Atty. Gen., for Attorney General Janet T. Mills