RALPH FARRIS, ATTORNEY GENERAL,
EX REL. BENJAMIN L. DORSKY,
RICHARD GUSTIN AND
CHARLES O. DUNTIN
*vs.*
HAROLD J. GOSS, SECRETARY OF STATE

Cumberland.  Opinion, July 13, 1948.

*Berman, Berman & Wernick,* for petitioner.

*Goodspeed & Goodspeed,* for respondent.

SITTING: STURGIS, C. J., THAXTER, TOMPKINS, FELLOWS, MERRILL, JJ.

THAXTER, J. The issue before the court in this case is a narrow one. The requisite number of electors of the state in accordance with the provisions of Article XXXI of the Constitution have taken the necessary steps to initiate a certain measure entitled "An Act to Protect the Right to Work and to Prohibit Secondary Boycotts, Sympathetic Strikes, and Jurisdictional Strikes." This proposed law which we shall hereinafter refer to as the "Barlow Bill," or the "initiated measure," was on March 25th and 27th, 1947, in accordance with Article XXXI, *supra,* proposed for enactment to the Legislature then in session. The Senate referred it to the Committee on Judiciary for the purpose of determining the sufficiency of the initiating petitions. The order of reference was concurred in by the House. The committee reported favorably and recommended that the "initiated measure" be submitted to the voters. The Legislature accepted this report and on April 15th at its direction

the committee report, the "initiated measure," and the petitions accompanying it were transmitted to the Secretary of State. Article XXXI, Sec. 18, of the Constitution provides in part as follows:

> "Any measure thus proposed by not less than twelve thousand electors, unless enacted without change by the Legislature at the session at which it is presented, shall be submitted to the electors together with any amended form, substitute, or recommendation of the Legislature, and in such manner that the people can choose between the competing measures or reject both."

The Legislature did not enact the "initiated measure" without change and it is now to be submitted to the electors at the general election to be held in September. A number of bills dealing with labor relations were filed with the same Legislature. Only one of these, which is now found in P. L. 1947, Chap. 395, was enacted. We shall hereinafter refer to this as the "Tabb Bill."

The attorney general, on relation of the petitioners who are representatives and officers of the Maine State Federation of Labor, has brought a petition for a writ of mandamus to compel the Secretary of State to place on the ballots to be submitted to the people at the September election the "Tabb Bill" "in such manner that the people of the State of Maine can choose between the two measures as competing measures or reject both of them." The Justice before whom the petition for the writ of mandamus was brought ordered the peremptory writ to issue as prayed for. Two exceptions were taken to this ruling: the first based on the finding that "in substance and effect, the 'Tabb Bill' was the Legislature's substitute for the 'Barlow Bill,' within the meaning of Sec. 18 aforesaid"; the second based on the finding that "in substance and effect the enactment of the 'Tabb Bill' was a 'recommendation' of the Legislature, within the meaning of Sec. 18 aforesaid."

If the "Tabb Bill" is a substitute for the "Barlow Bill," the writ of mandamus was properly issued. In the view

which we take of the problem before us, we need consider only the first exception which covers this point.

We have here the problem of construing Article XXXI of the Constitution, perhaps not so much of construing it, for its language is not ambiguous, but of applying it to the problem before us; also we must determine whether the "Tabb Bill" is, within the meaning of Article XXXI, a substitute for the "Barlow Bill."

In construing a statute, and the same principle holds true with respect to the Constitution, we look primarily to the language used which may be illumined in cases of doubt by the surrounding circumstances. *Dominion Fertilizer Co.* v. *White,* 115 Me. 1, 4; *In re Frank McLay,* 133 Me. 175; *Guilford* v. *Monson,* 134 Me. 261; *Old South Association* v. *Boston,* 212 Mass. 299; *Plunkett* v. *Old Colony Trust Co.,* 233 Mass. 471; *Bayon* v. *Beckley,* 89 Conn. 154; *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290; 41 L. Ed. 1007; Note 70 A. L. R. 10.

Justice Holmes, before he became a member of the Supreme Court, made a statement which is peculiarly applicable here: "We do not inquire what the *Legislature* meant, we ask only what the *statute* means."

This court is not concerned with the consequences of statutory or constitutional provisions. Our duty is to interpret, not to make the law.

Article XXXI of the Constitution of this state became effective as an amendment on January 1, 1909, almost forty years ago. It made a fundamental change in the existing form of government in so far as legislative power was involved. Formerly that power was vested in the House of Representatives and the Senate. By the amendment the people reserved to themselves power to propose laws and to enact or reject the same at the polls independent of the Legislature, and also reserved power at their own option to approve or reject at the polls any act, bill, resolve or resolution passed by the joint action of both branches of the

Legislature. The amendment provides that after its adoption the style of acts and laws instead of being "Be it enacted by the Senate and House of Representatives in Legislature Assembled" shall be "Be it enacted by the People of the State of Maine." In short, the sovereign which is the people has taken back, subject to the terms and limitations of the amendment, a power which the people vested in the Legislature when Maine became a state. The significance of this change must not be overlooked, particularly by this court whose duty it is to so construe legislative action that the power of the people to enact their laws shall be given the scope which their action in adopting this amendment intended them to have.

The right of the people, as provided by Article XXXI of the Constitution, to enact legislation and approve or disapprove legislation enacted by the legislature is an absolute one and cannot be abridged directly or indirectly by any action of the Legislature. Sec. 18 of this article, it is to be noted, does not in any manner encroach on the prior power of the Legislature to enact legislation.

It does, however, provide and make it mandatory that, if an initiated measure is not enacted by the Legislature without change, it, "together with any amended form, substitute, or recommendation of the legislature" . . . . . shall be submitted to the electors . . . . . "in such manner that the people can choose between the competing measures or reject both." Neither by action nor by inaction can the Legislature interfere with the submission of measures as so provided by the Constitution. And if the constitutional provisions should not be so complied with in the submission of a substitute for the initiated measure, the people would be denied their right to choose between the two.

There is a clear distinction between a provision abridging the power of the Legislature to enact certain classes of legislation pending an initiated measure, and a provision requiring that if such class of legislation be enacted, the same be

submitted to the people, together with the initiated measure. As we have said, Sec. 18 places no curb on the enactment of legislation; but a bill enacted which is a substitute for the initiated measure must go to the electors with the initiated measure, and does not become a law until they approve it under the provisions of Sec. 18.

Sec. 22 of Article XXXI reads as follows:

> "Until the legislature shall enact further regulations not inconsistent with the constitution for applying the people's veto and direct initiative, the election officers and other officials shall be governed by the provisions of this constitution and of the general law, supplemented by such reasonable action as may be necessary to render the preceding sections self executing."

This section, when read in connection with Secs. 18 and 20, establishes that Sec. 18 is self executing. The machinery for submission of the initiated bill and the substitute is the same; and in each case the same obligation is on the Secretary of State.

Is the "Tabb Bill" a substitute for the "Barlow Bill"? In answering this question we are not concerned, as we have tried to point out above, with how the Legislature may have regarded it. We must decide only what it is in fact.

A bill which deals broadly with the same general subject matter, particularly if it deals with it in a manner inconsistent with the initiated measure so that the two cannot stand together, is such a substitute as was referred to in Article XXXI. This is the test laid down in *Starbird* v. *Brown*, 84 Me. 238, to determine whether one statute may either have amended or repealed an existing law. The court there said, page 240: "Can the new law and the old law be each efficacious in its own sphere?" And in *Maine Central Institute* v. *Inhabitants of Palmyra*, 139 Me. 304, the question was whether Sec. 92 of Chap. 9 of R. S. 1930, or Sec. 93 of the same chapter were so inconsistent that they could not stand together. Sec. 92 was in fact based on a later

enactment than Sec. 93. Sec. 93 provided that under certain specified conditions a youth residing in a town had the right to attend a school in any other town to which he might gain admittance, the tuition not exceeding $100 being charged to the town of his residence. Sec. 92 gave to the town of his residence the right under specified conditions to contract for such tuition. This court held that "all statutes on one subject are to be viewed as one and such a construction be made as will as nearly as possible make all the statutes dealing with the one subject consistent and harmonious." The court then called attention to the fact that the two statutes referred to the same subject matter; that they were repugnant; and that the later one must be regarded as a substitute for the former, on the theory as expressed in *Knight* v. *Aroostook Railroad,* 67 Me. 291, 293, that there is an inference "that the Legislature cannot be supposed to have intended that there should be two distinct enactments embracing the same subject matter in force at the same time . . . . ." The "Tabb Bill," as we shall point out more fully later, did cover the same subject matter as the "initiated measure" and was inconsistent with it in essential respects. By parity of reasoning with the *Palmyra* opinion, the "Tabb Bill" must be regarded as a substitute for the "initiated measure" and must be submitted to the people as a "competing measure" in accordance with Article XXXI.

The Legislature had before it at the time the initiating petitions were filed a number of measures dealing with labor relations. One of these was a bill proposed by Representative Tabb, which was reported favorably by the Committee on Labor in a new draft on March 27, 1947. It was intended to ban the closed shop. Another was designated the Maine Labor Relations Act. Another was designed to prevent strikes against public utilities and municipal corporations; and another which we shall refer to as the "Woodbury Bill," introduced in the House on February 13, 1947, was identical with the "initiated measure." The House of Rep-

resentatives of the 93rd Legislature on March 12, 1947 asked the Justices of the Supreme Judicial Court for their opinion of the constitutionality of Secs. 122 to 129, inclusive, of the "Woodbury Bill." These are all the essential features of the bill. On March 25, 1947 five of the six justices of this court, the sixth being unable to act because of illness, declared that Sec. 123 would be constitutional; that Secs. 126, 127, 128 and 129 would be unconstitutional; and that Secs. 122, 124 and 125 would be within the power of the Legislature to enact, depending on the construction which the Supreme Court of the United States might place on the power of the federal government under the National Labor Relations Act to deal with their subject matter. Opinions of the Justices, 142 Me. 420. The important sections of the proposed bill were those which the justices of this court declared were unconstitutional, and Secs. 122 and 124 which we held the Legislature might have the power to enact, and Sec. 123. Sec. 125 barred an employer from conditioning employment on the payment of union dues or charges, and was really designed to aid in making effective Secs. 122 and 124, which dealt with the closed shop and the union shop. The Legislature did not enact the "Woodbury Bill" which we have said was identical with the "initiated measure"; but it did in the "Tabb Bill" deal with the same subject matter as was involved in the sections of the "Barlow Bill" which the members of this court, in their answers to the questions of the House with respect to the "Woodbury Bill," had said were or might be constitutional. And in some respects it dealt with this subject matter in either a different or inconsistent manner than it was dealt with in the "Barlow Bill."

In other words, the effective parts of the two measures cannot stand together. Under these circumstances, the ruling of the sitting justice that the "Tabb Bill" was a substitute for the "Barlow Bill" was correct, and the order that the peremptory writ issue was not error.

*Exceptions overruled.*

DISSENTING OPINION

MURCHIE, J. The constitutional construction accomplished by the majority opinion, by the surprisingly simple expedient of stating that the amendment construed, Amendment XXXI, is not being construed but applied, seems to me to constitute such a flagrant judicial usurpation of legislative power (by redirecting it in a manner the Constitution does not expressly authorize) and such a palpable disregard of executive power (by ignoring it) that a statement of the reasons underlying my personal views seems imperative.

The legislative power conferred on the Legislature by Article IV, Part First, Sec. 1, is stated in Article IV, Part Third, Sec. 1 to be the power "to make and establish * * laws" (subject to referendum). In the adoption of Amendment XXXI the framers deemed it necessary to write in a special grant of power to the legislature to authorize it to "enact measures expressly conditioned upon * * ratification by a referendum vote." Article IV, Part Third, Sec. 19. The words which the decision construes and applies, in professed application of unambiguous language, are:

> "together with any amended form, substitute, or recommendation of the legislature."

They grant power to the legislature, as the majority opinion recognizes. That opinion, however, construes them as if they were followed by the additional words "enacted by the legislature," or, perhaps, "which the legislature purports to enact." The word "enact" has no conditional meaning according to lexicographers, although it is used in the Constitution in a conditional sense in that part of Article IV, Part Third, Sec. 19 quoted above. In its usual and ordinary signification it is equivalent to the words "make and establish" used in Article IV, Part Third, Sec. 1. Whichever of the alternative sets of words (quoted above) the majority opinion has read into the Constitution, or whatever words

competent to accomplish the result have been read in, the effect is to negative the statement that Sec. 18 of Amendment XXXI:

"does nòt in any manner encroach on the * power of the legislature to enact legislation."

The opinion declares that the Tabb Bill was "enacted" in one place but decides that it was not, that only the electors possess the legislative power to enact it. The words read into the Constitution, whatever they may be, convert a grant of power into a restriction on the legislative power of the legislature.

The opening words of the fourth paragraph of the majority opinion:

"We have * the problem of construing Article XXXI of the constitution,"

state the issue of the case as I see it but there is a retraction of the effect of those words in the sentence in which they appear. It resorts to the expedient of declaring a different one on the ground that the language of the amendment "is not ambiguous" and is merely to be applied. Notwithstanding that declaration the two paragraphs immediately following, and much subsequent language, are devoted to principles of statutory construction. No reference is made to what 11 Am. Jur. 674, Par. 61 declares to be the fundamental principle of constitutional construction:

"to give effect to the intent of the framers."

That intent is ascertainable in the Legislative Record of the legislature which proposed it. Amendment XXXI was proposed to the electors by Resolves of 1907, Chap. 121. That resolve was referred to and reported by the Committee on Judiciary of the Seventy-third Legislature. It was passed in the form reported by that committee, after debate in which one of the members of that committee construed

the words controlling the present case. Among the members of the committee were Luere B. Deasy, later the fourteenth Chief Justice of this Court, and Charles F. Johnson, later a Circuit Judge of the United States Circuit Court of Appeals. The construction declared in debate was that of Judge Johnson. Chief Justice Deasy offered no construction but his silence indicates his assent to that of Judge Johnson, appearing at Page 640 of the 1907 Legislative Record:

> "The Legislature if it sees fit may enact * * * (an initiated law). If not, it must submit * * * (it). The Legislature may submit a measure competing with * * * (it)."

This construction controlled the action of the Seventy-fifth Legislature in dealing with the initiated law which became P. L. 1913, Chap. 221. The manner of dealing is apparent when it is compared with P. L. 1911, Chap. 199. The Legislative Record for 1911 gives the details. The initiated law was not enacted by the legislature without change. The legislature enacted a law which is an apparent substitute for it, or a part of it. William R. Pattangall, who became the fifteenth Chief Justice of this court, was a member of that Legislature, wherein the initiated bill was known as the Davies Bill and the law enacted as the Pennell Bill. When they were debated Chief Justice Pattangall affirmed the construction of the amendment declared by Judge Johnson as one of the framers. His statement appears at Page 1065 of the 1911 Legislative Record:

> "There are only two courses open to us * * * to adopt the Davies Bill or the Pennell Bill. My * preference would be * to adopt the Pennell Bill at the present time, and submit the other bill to the voters * * *. * * they may adopt the Davies bill if they desire."

Immediately thereafter Mr. Davies presented an order directing that the Davies Bill and the Pennell Bill be sub-

mitted as competing measures, which was indefinitely postponed. Legislative Record, 1911, Page 1066.

Legislative Records, as sources of information concerning legislative intention, are brushed aside apparently in the majority opinion by its reference to a statement of Justice Holmes, the source of which is not identified. Justice Holmes was dealing with statutory as distinguished from constitutional construction, as the quoted language shows. If the source had been given his statement might not be at variance with the last word on the subject of the availability of legislative debate to determine legislative intention on a constitutional issue. *United States* v. *Congress of Industrial Organizations et al.* (No. 695, October Term 1947). The Supreme Court of the United States recognizes both that legislative intention is controlling on questions of constitutional construction and that courts may refer to legislative debates to ascertain it.

The majority opinion ignores the consequences of the construction it applies, and admits it frankly. Its reference to consequences carries recognition that they may be disastrous.

Several potentials are apparent. The most outstanding one is that the construction may operate to deprive the people of a right more valuable than that it assures. The reservation to the people in Article IV, Part First, Sec. 1 is not merely to "propose" but to "enact" (or reject) laws. Express provision is that the people may vote on a forthright issue if a law proposed is not enacted without change. The legislature is granted the power to change the issue to a more complicated one, but the amendment recognizes that the majority will might be rendered ineffective thereby in the absence of a second vote and grants such a vote if neither competing bill receives a majority and one garners more than a third. To illustrate the point apply the fraction used in the Constitution to control the second chance. Assume approximate thirds in favor of each of the com-

peting bills and against both, with just enough variation to put the second vote in operation, i.e. 34% for one bill, 33% for the other and 33% against both. The affirmative vote of 67% of the electors favoring the prohibition of yellow-dog contracts and closed shops will be frustrated until after the general election to be held in 1950 at least and longer if the 33% opposing both bills use the formula, set up by the court, of re-proposing the rejected initiated legislation or proposing some new legislation along the same lines, insulated against enactment without change by the inclusion of unconstitutional provisions. The illustration might be made more extreme. The action of the voters on the competing bills could record 97% of the electors as favoring the prohibition of yellow-dog contracts and closed shops, and render their votes ineffective if the division was 49% for one bill and 48% for the other.

A second disastrous result is the establishment of an uncertain field for the legislative power exercisable by the legislature. Such power should be ascertainable by any legislature when it convenes by reference to the Constitution and existing laws. Comparison of the provisions of our Constitution with those of Arizona illustrates the point. The Arizona Constitution denies the legislature the power to repeal or amend any law enacted by majority vote of the electors (see the quotation of it by the Arizona court in *McBride et al.* v. *Kerby,* 32 Ariz. 515; 260 Pac. 435.) Arizona gives a majority of the electors, and not the initiators of legislation, the power to curtail the legislative power of the legislature.

A third disastrous consequence is the impracticability of applying the construction declared in all contingencies. The majority opinion records that the present legislature considered a number of bills that might have been considered substitutes for the Barlow Bill within the broad meaning attributed to the word "substitute." If the legislature had enacted or purported to enact two of them, the

impracticability would be very apparent. The Constitution does not provide for the submission of more than one competing bill. The result of the vote on competing bills is to be determined by the action of the voters on "neither" or "both." The word "neither" might be applicable to more than two competing bills. The word "both" is more restrictive. If the legislature had enacted or purported to enact two laws coming under the ban declared applicable to the Tabb Bill, which of them would have been the competing bill to be submitted? What would be the status of the other? Obviously the Secretary of State could not declare it null and void. The power to do so is a judicial power. Would the court take that action without having the question raised in a manner always considered requisite heretofore to invoke that extraordinary judicial action?

When a construction of constitutional language which seems reasonable without reference to results carries the potential of disastrous ones, a construction should be sought which will avoid them if violence is not done to constitutional language. Such a construction was declared in this instance by one of the framers of Amendment XXXI. His construction has been applied heretofore by legislative power. It does no violence to the language but declares merely that the grant of power to the legislature is that and nothing more. It recognizes the power as one requiring a caveat indicating the risks involved in its exercise.

The construction which the majority opinion declares for the word "substitute" gives it the broadest possible meaning. Lesser meanings that would be proper are so apparent they do not need recital. The construction applied is supported by declarations that the Tabb Bill "deals broadly" with the Barlow Bill, in a manner "inconsistent" with it, and that the two "cannot stand together." The Barlow Bill deals with eight subjects, the Tabb Bill with two of them. Is that dealing "broadly"? I record my individual judgment that it is not. I am unwilling to rate the relative im-

portance of different provisions of a law the people seek to enact. The majority of the court does not hesitate to do so. It offers no specification of any inconsistency of the manner in which the two bills deal with yellow-dog contracts and closed shops. It cannot, because there is none. Both bills prohibit those things. The difference is one of phraseology and not of effect. If the changed phraseology can be said to produce any inconsistency, the answer is found in the cases cited in the majority opinion in the very paragraph where the fact of inconsistency is stated. If the Tabb Bill was recognized as effective law and the Barlow Bill should be enacted at the September election, the enactment of it would repeal any provision of the Tabb Bill inconsistent with it.

To support my opening statement that the construction applied by the majority opinion constitutes a flagrant judicial usurpation of legislative power, I note that prior to its issue no court of last resort in any jurisdiction operating under a written constitution has ever declared that judicial power has any right of control over enacted law except to construe it or determine it to be null and void. No court heretofore has assumed judicial power to construe legislative action taken under rules adopted by a legislature to govern its proceedings. Our Constitution vests authority in the legislature to "determine the rules of its proceedings." Article IV, Part Third, Sec. 4. In doing so it established long since rules for making and establishing law in accordance with the grant of power contained in Article IV, Part Third, Sec. 1. After the enactment of Article IV, Part Third, Sec. 19, it adopted rules to regulate the exercise of its power to enact laws conditionally. When, if ever, it determines to exercise the power granted to it by Article IV, Part Third, Sec. 18, and change the issue which the initiation of legislation requires to be submitted to the electors if an initiated law is not enacted without change, this court owes it the courtesy of recognizing that it will adopt rules sufficient for the purpose. Such rules are fore-

cast by those adopted to exercise the power granted in Article IV, Part Third, Sec. 19. In every case where that power has been exercised heretofore the law conditionally enacted has declared its conditional nature and framed a question to be submitted to the electors with reference to it.

The majority opinion identifies certain laws pending before the present legislature when the Barlow Bill was initiated. Original and new draft forms of the Woodbury Bill are Legislative Documents 754 and 1487. The latter is an amended form of the former and of the Barlow Bill. Original and new draft forms of the Maine Labor Relations Act are Legislative Documents 1299 and 1404. Either might might be considered a substitute for the Barlow Bill. The indefinite postponement of these two bills discloses that legislative action was exercised to leave unchanged the issue required to be submitted to the electors by the legislative refusal to enact the Barlow Bill without change. The legislature declared that intention in accepting the report of its Committee on Judiciary. It reaffirmed that intention by indefinitely postponing both an amended form and a substitute.

The opinion of the majority shows an utter disregard of the established principles of law that judicial power can neither coerce legislative power to act nor restrain it from acting although the constitutional mandate to act or not to act is entirely clear, 34 Am. Jur. 910, Par. 128, and that all doubts concerning the constitutionality of the exercise of legislative power should be resolved in favor of constitutionality. *Ogden* v. *Saunders,* 12 Wheat. 213; 6 L. Ed. 606. Both are subverted by decision that judicial power may construe legislative action as well as legislation, a principle of far greater range than that declared by Chief Justice Marshall in *Marbury* v. *Madison,* 1 Cranch 137; 2 L. Ed. 60, that judicial power might declare a law enacted by legislative power and approved by executive power null and void. Under it legislative action was not construed but recognized as taken for the purpose the legislature intended. The

ineffectiveness of the legislation was due to its unconstitutionality. Under the newly declared principle legislative action designed by legislative rules of proceedings to enact a law prohibiting yellow-dog contracts and closed shops "for the * * benefit of the people" (the words of Article IV, Part Third, Sec. 1) is not only declared ineffective for the legislative purpose it declares but rendered worse than futile because it is given another and different effect based on the fact that an initiated law seeking to impose the identical prohibitions sought more prohibitions. It is worse than futile because its conversion to an unintended legislative purpose deprives the electors of the right to vote directly upon an issue raised in a constitutional manner. The lesser rights to pass upon competing bills and to have a second election on one of them, if both are not defeated and one receives more than a third of the votes, are meaningless because of the inevitable delay involved. What the electors who proposed the Barlow Bill sought to determine by its proposal, so far as yellow-dog contracts and closed shops are concerned, was whether either the legislature or the people desired to prohibit them not later than September 1948. That issue cannot be resolved by a vote on the particular competing bills except in negative fashion unless one of them receives a majority of the votes cast for and against both. A majority vote against both bills will close the issue. If the negative votes constitute a minority and one, or both, of the competing bills receives more than a third of the total, the second opportunity to vote two years hence will salvage nothing worth while so far as the people's rights are concerned. Those rights will have been frustrated, temporarily or permanently, by construing the Constitution in a manner directly opposed to the intention of the framers.

In closing I note a result astounding. The decision lays the groundwork for future trouble of inestimable range. What is to be the result in a case on all fours with the present, except the intervention of mandamus? Suppose a ma-

jority of the electors vote to enact a law and a prosecution under it. Will the court say that law is unconstitutional because the legislature mussed things up? Will it throw the responsibility on the Secretary of State? The decision means that it will do one or the other. As an alternative, suppose a prosecution under the law enacted by the Legislature, if the electors reject the proposed legislation. Will the court say the law is unconstitutional because enacted at a time when the power of the legislature to enact it was temporarily suspended? That again is what the decision means. Under Judge Johnson's construction of the Constitution, on which the Legislature acted in 1911, neither of these absurd consequences would be possible. I believe the exceptions should be sustained on the ground that legislative power is not providing a substitute under Article IV, Part Third, Sec. 18 when it enacts a part of an initiated bill under Article IV, Part Third, Sec. 1, and that its rules of proceedings are an unfailing guide to indicate the purpose of its action.