MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2020 ME 110
Docket:      Ken-20-169
Argued:      July 28, 2020
Decided:     August 13, 2020

Panel:       MEAD, GORMAN, JABAR, HUMPHREY, and HORTON, JJ.

CLARE HUDSON PAYNE et al.

v.

SECRETARY OF STATE et al.

PER CURIAM

[¶1]   This case is before us on report from the Superior Court (Kennebec County, *Murphy, J.*) pursuant to M.R. App. P. 24(a).   The report submits three questions of law concerning a people's veto effort seeking to suspend P.L. 2019, ch. 539, entitled "An Act To Implement Ranked-choice Voting for Presidential Primary and General Elections in Maine," through the November 3, 2020, general election.   *See* Me. Const. art. IV, pt. 3, § 17(2) ("The effect of any Act, bill, resolve or resolution or part or parts thereof as are specified in such petition shall be suspended upon the filing of such petition."). This opinion is limited to these questions and does not address any substantive issues presented by ranked-choice voting in Maine.   *See Me. Senate v. Sec'y of*

*State*, 2018 ME 52, ¶ 1, 183 A.3d 749.  We accept the report and answer the three questions as follows:

> I.  The session of the 129th Legislature in which L.D. 1083 (129th Legis. 2019) was "passed" by the Legislature pursuant to Me. Const. art. IV, pt. 3, §§ 16-17, is that of the Second Regular Session.
>
> II.  Public Law 2019, ch. 539, was not effective on January 12, 2020.
>
> III.  Title 21-A M.R.S. § 901(1) (2020) permits the filing of an application for a people's veto petition with the Department of the Secretary of State prior to the adjournment of the legislative session in which the Act in question was passed.

[¶2]  Accordingly, we remand the matter to the Superior Court for further proceedings.

## I.  BACKGROUND

[¶3]   The story of ranked-choice voting in Maine has included many twists and turns since the system's introduction in 2016.  We do not recount the earlier chapters of that story here, *see generally Me. Senate*, 2018 ME 52, ¶¶ 3-13, 183 A.3d 749; instead, our focus is on the Legislature's recent enactment of P.L. 2019, ch. 539, extending ranked-choice voting to presidential primary and general elections, and the people's veto petition opposing that law.

[¶4]  The parties agree upon the facts.  In spring 2019, the First Regular Session of the 129th Legislature introduced and debated L.D. 1083, "An Act To Implement Ranked-Choice Voting for Presidential Primary and General

Elections in Maine." The Maine House of Representatives voted in favor of the bill, but the bill remained unfinished business in the Senate when the First Regular Session of the 129th Legislature adjourned *sine die* on June 20, 2019, and was carried over pursuant to a Joint Order. On August 26, 2019, the one-day First Special Session of the Legislature convened, and the Senate concurred in enacting L.D. 1083, as amended by Committee Amendment A. *See* Comm. Amend. A to L.D. 1083, No. S-313 (129th Legis. 2019). That same day, the Legislature presented the bill to the Governor and adjourned *sine die*.

[¶5] On September 6, 2019, the Governor announced her intent to allow L.D. 1083 to become law without her signature in January 2020 during the Second Regular Session of the 129th Legislature. *See* State of Maine Office of Governor Janet T. Mills, *Governor Mills Statement on Ranked Choice Voting for Presidential Primary and General Elections in Maine* (Sept. 6, 2019), https://www.maine.gov/governor/mills/news/governor-mills-statement-ranked-choice-voting-presidential-primary-and-general-elections-maine.

[¶6] On September 10, 2019, counsel for Demitroula Kouzounas, the intervenor in the present matter, communicated with Deputy Secretary of State Julie L. Flynn. Referencing a 1979 opinion of the Attorney General, Flynn opined that L.D. 1083 would not be considered "passed" until "it has been

4

signed by the Governor, vetoed with the Legislature then overriding the veto, or allowed to become law without the Governor's signature." *See* Op. Me. Att'y Gen. 79-170. Citing article IV, part 3, section 2 of the Maine Constitution, Flynn explained that, without the Governor's signature, the law would not be "passed" until the "fourth day after . . . this Legislature reconvenes." Flynn told Kouzounas that the period within which she could file a people's veto application pursuant to 21-A M.R.S. § 901(1) would not start until after the law became chaptered in 2020. However, Flynn recognized that "someone might take a contrary position and argue that the 10-business day period for filing an application to circulate a people's veto position, pursuant to 21-A M.R.S. § 901(1), started to run once the special session ended on August 26th," in which case "the deadline for filing an application under this statute would be today." Flynn told Kouzounas's counsel that should she decide to file an application that day, "we are willing to keep [the application] on file, but . . . would not consider the application 'complete' until after the legislation has become a chaptered public law. This means we would not draft a ballot question or create a petition form for circulation, pursuant to 21-A M.R.S. § 901(4) [(2020)], until after the public law is filed with us in January."

Kouzounas filed an application for people's veto regarding L.D. 1083 that same day—on September 10, 2019.

[¶7] In accordance with Maine's biennial legislative system, the Second Regular Session of the 129th Legislature convened on January 8, 2020. The Governor did not return L.D. 1083 to the Legislature "within 3 days after" the beginning of the Second Regular Session, and the bill was chaptered as P.L. 2019, ch. 539, without her signature on January 12, 2020. Me. Const. art. IV, pt. 3, § 2. On January 16, 2020, Kouzounas filed an application for a people's veto regarding chapter 539 with the Department of the Secretary of State. On February 3, 2020, the Secretary approved the application and provided petition forms with which to collect signatures.

[¶8] On March 3, 2020, the Secretary of State administered presidential primary elections without the use of ranked-choice voting for the Democratic candidates, and Joseph R. Biden Jr. was declared the victor based on a plurality of the vote. In light of the COVID-19 pandemic, the Second Regular Session of the 129th Legislature adjourned *sine die* on March 17, 2020.

[¶9] In April 2020, Clare Hudson Payne, Philip Steele, Frances M. Babb, and the Committee for Ranked Choice Voting (collectively, the Committee) filed a complaint in the Superior Court against the Secretary of State seeking a

6

declaratory judgment (1) that the people's veto petition was invalid on the grounds that the law had taken effect on January 12, 2020, and a people's veto was thus untimely, or (2) alternatively, that the people's veto application was improperly filed because 21-A M.R.S. § 901(1) prevents the filing of an application prior to the adjournment of the Legislature. The Committee requested injunctive relief that would prevent the Secretary from accepting or balloting the people's veto measure for the November 2020 general election. In its complaint, the Committee noted that, pursuant to article IV, part 3, section 17(2) of the Maine Constitution, the Secretary's acceptance of the petition would "[have] the effect of suspending the 2019 [ranked-choice voting] Law, which would alter and impact Maine voting in the 2020 general election for the President of the United States." Kouzounas moved to intervene in the suit.

[¶10] On June 15, 2020, the 90th day after the recess of the Second Regular Session, proponents submitted a people's veto petition containing, on its face, more than the 63,067 signatures required in order to place a proposed veto of chapter 539 on the ballot at the general election in November 2020. *See* Me. Const. art. IV, pt. 3, § 17(1) (stating "Upon written petition of electors, the number of which shall not be less than 10% of the total vote for Governor cast

in the last gubernatorial election preceding the filing of such petition . . . ."); Me. Const. art. IV, pt. 3, § 17(3) (providing that a people's veto measure is voted on "at the next statewide or general election, whichever comes first, not less than 60 days after" the public proclamation announcing suspension of the law).

[¶11]  The parties agreed to stipulated facts in the Superior Court matter. In an order signed June 15, 2020, the Superior Court granted a report to us to resolve the following three questions of law pursuant to M.R. App. P. 24(a).

I.  Which session of the 129th Legislature was the session at which L.D. 1083, An Act to Implement Ranked-choice Voting for Presidential Primary and General Elections in Maine, was passed for purposes of Me. Const. art. IV, pt. 3, §§ 16 and 17?

II.  Was P.L. 2019, ch. 539 effective January 12, 2020?

III.  Does 21-A M.R.S.A. § 901(1) permit filing of a people's veto application with the Department of the Secretary of State prior to adjournment of the legislative session at which the Act in question was passed?

## II.  DISCUSSION

[¶12]  When the trial court reports questions pursuant to M.R. App. P. 24(a),[1] "we independently determine whether acceptance of the report

---

[1] Maine Rule of Appellate Procedure 24(a) states,

> **(a) Report by Agreement of Important or Doubtful Questions.**  When the trial court is of the opinion that a question of law presented to it is of sufficient importance or doubt to justify a report to the Law Court for determination, it may so report when:

8

is consistent with our basic function as an appellate court or would improperly place us in the role of an advisory board due to the lack of a final trial court judgment to review." *Me. Senate*, 2018 ME 52, ¶ 14, 183 A.3d 749 (quotation marks omitted). Although we recognize that Rule 24 operates as an exception to the final judgment rule and "should be used sparingly," *Liberty Ins. Underwriters v. Estate of Faulkner*, 2008 ME 149, ¶ 5, 957 A.2d 94 (quotation marks omitted), we grant the report in the present matter because all of the criteria for application of Rule 24(a) have been met, *see Me. Senate*, 2018 ME 52, ¶ 14, 183 A.3d 749.

A.     Questions I and II

[¶13]   The parties dispute which legislative session, the First Special Session or the Second Regular Session, is the session in which L.D. 1083 was "passed" within the meaning of sections 16 and 17 of article IV, part 3, of the Maine Constitution. Me. Const. art. IV, pt. 3, §§ 16-17. The unique procedural circumstances of the present matter, coupled with a paucity of evidence of legislative intent, make this question of first impression a difficult one.

---

**(1)** all parties appearing agree to the report;

**(2)** there is agreement as to all facts material to the appeal; and

**(3)** the decision thereon would, in at least one alternative, finally dispose of the action.

[¶14]  Sections 16 and 17 provide in relevant part,

> **Section 16.  Acts become effective in 90 days after recess; exception; emergency bill defined.**  No Act or joint resolution of the Legislature . . . shall take effect until 90 days after the recess of the session of the Legislature in which it was passed, unless in case of emergency . . . .

> **Section 17. Proceedings for people's veto.**

> **1.  Petition procedure; petition for people's veto.**  Upon written petition of electors, the number of which shall not be less than 10% of the total vote for Governor cast in the last gubernatorial election preceding the filing of such petition, and addressed to the Governor and filed in the office of the Secretary of State by the hour of 5:00 p.m., on or before the 90th day after the recess of the Legislature, or if such 90th day is a Saturday, a Sunday, or a legal holiday, by the hour of 5:00 p.m., on the preceding day which is not a Saturday, a Sunday, or a legal holiday, requesting that one or more Acts, bills, resolves or resolutions, or part or parts thereof, passed by the Legislature but not then in effect by reason of the provisions of the preceding section, be referred to the people . . . .

Me. Const. art. IV, pt. 3, §§ 16-17(1).  The Committee argues that section 17 requires that the phrase "passed by the Legislature" be limited to an understanding in which "passed" means the final passage by the House and Senate and does not contemplate later presentment to and action by the Governor.  The Committee urges that by expressly including the word "bills" in section 17, the framers of the people's veto envisioned the present situation.  In advancing the theory that sections 16 and 17 refer solely to actions taken by

10

the Legislature, the Committee points to a number of other places in the Constitution in which the word "pass" is used to describe legislative conduct.[2] These references, the Committee suggests, generate the negative implication that the ranked-choice voting law could not have been "'passed' by any action or inaction of the Governor," whose role is not to "pass" laws but to "approve" them. *See* Me. Const. art. IV, pt. 3, § 2 (explaining that when a bill is "presented to the Governor, and if the Governor *approves*, the Governor shall sign it" (emphasis added)).

[¶15] In opposition to the Committee's view, the Secretary and Kouzounas suggest that determining the session of the Legislature in which a law was "passed" within the meaning of sections 16 and 17 cannot be accomplished without also considering the Governor's role in the enactment of laws, as specified in section 2 of article IV, part 3, of the Maine Constitution. In their view, "passed" must be interpreted to refer to the completion of the legislative process rather than being limited to the Legislature's actions within

---

[2] *See, e.g.*, Me. Const. art. IV, pt. 1, § 1 (observing the people's "power at their own option to approve or reject at the polls any Act, bill, resolve or resolution *passed* by the joint action of both branches of the Legislature" (emphasis added)), pt. 3, § 2 ("Every bill or resolution, having the force of law . . . which shall have *passed* both Houses, shall be presented to the Governor," whereby a Governor's veto returning the bill to the House in which it originated may be overturned if "2/3 of that House shall agree to *pass* it" before sending the measure to the other House for approval (emphasis added)), pt. 3, § 19 (stating that the Governor's veto power "shall not extend to . . . any measure initiated by the people and *passed* by the Legislature without change" (emphasis added)).

that process. As Kouzounas and the Secretary explain, pursuant to section 2, a bill cannot become operative until the Governor is involved.

[¶16] Section 2 provides in relevant part,

Every bill or resolution, having the force of law, . . . shall be presented to the Governor, and if the Governor approves, the Governor shall sign it . . . . If the bill or resolution shall not be returned by the Governor within 10 days (Sundays excepted) after it shall have been presented to the Governor, it shall have the same force and effect as if the Governor had signed it *unless the Legislature by their adjournment prevent its return, in which case it shall have such force and effect, unless returned within 3 days after the next meeting of the same Legislature which enacted the bill or resolution*; if there is no such next meeting of the Legislature which enacted the bill or resolution, the bill or resolution shall not be a law.

*Id.* (emphasis added). Here, the Legislature prevented the Governor's return of the bill when it adjourned from its one-day First Special Session on August 26, 2019, after passing L.D. 1083. Because the same biennial Legislature (the 129th) convened on January 8, 2020, for its Second Regular Session—"the next meeting of the same Legislature which enacted the bill" pursuant to section 2—the Governor had until January 12, 2020, to approve or return the bill. Me. Const. art. IV, pt. 3, § 2. The Governor took neither action during that window, and thus the bill acquired "the same force and effect as if the Governor had signed it" on January 12. *Id.* The Secretary and Kouzounas also argue that the bill did not become effective until June 15, 2020, 90 days

after the recess of the Second Regular Session, the legislative session in which the bill became law without the Governor's signature and therefore the session in which the bill "passed." *See* Me. Const. art. IV, pt. 3, §§ 16-17.

[¶17] When interpreting provisions of the Maine Constitution, "we look primarily to the language used. Because the same principles employed in the construction of statutory language hold true in the construction of a constitutional provision, we apply the plain language of the constitutional provision if the language is unambiguous. If the provision is ambiguous, we determine the meaning by examining the purpose and history surrounding the provision." *Voorhees v. Sagadahoc County*, 2006 ME 79, ¶ 6, 900 A.2d 733 (citations omitted) (quotation marks omitted).

[¶18] When construing the plain language, we interpret the Constitution's words in light of what meaning they would convey to an "intelligent, careful voter." *Allen v. Quinn*, 459 A.2d 1098, 1100 (Me. 1983) (quotation marks omitted). Section 20 of article IV, part 3, which was enacted at the same time as sections 16 and 17 as part of Amendment XXXI, defines a number of words and phrases used in article IV but does not define the word "pass." *See* Me. Const. art. IV, pt. 3, § 20 (providing definitions including "electors," "people," "recess of Legislature," "statewide election," and "written

petition"); Resolves 1907, ch. 121 (effective Jan. 6, 1909). Nor is the verb defined elsewhere in the Constitution. Dictionary definitions from the time when the initiative and referendum provisions of the Constitution were enacted cut in favor of both interpretations and do not resolve the question at hand.[3]

[¶19] The Committee's observation that section 17 enables individuals to submit "Acts, *bills*, resolves or resolutions" to a people's veto, Me. Const. art. IV, pt. 3, § 17(1) (emphasis added), although correct, does not persuade us that the Legislature included the word "bills" in contemplation of the present procedural thicket—where the Legislature passed a law but where the law remained inoperative for more than ninety days after the recess of the session in which both Houses passed the bill. The Committee fails to acknowledge the circularity of that interpretation. Taken literally, it is difficult to comprehend a meaningful distinction in this context between section 17's "Acts" and "bills." Even assuming that a "bill" is a "proposal for a law" whereas

---

[3] *See, e.g.*, *Pass*, Webster's New International Dictionary of the English Language (1909) ("13. To advance through all the steps necessary to validity or effectiveness; to be carried through a body that has power to sanction or reject; to receive legislative sanction; to be enacted; as, the bill *passed*."); *Passage*, *id.* ("8. Of a measure or law: Act of passing; sanction; enactment. Ordinarily *passage* refers to the final affirmative action by which the assembly enacts the law; but it has been also sometimes used to designate the time of taking effect of the act; or the final act necessary to make it a valid law, as the signing or approving by the governor or other executive." (citations omitted)).

an "Act" is a "[b]ill passed or enacted by both chambers that becomes a public law,"[4] when applying the Committee's narrow construction, any relevant distinction between the two dissolves in the context of section 17 because section 17 ascribes to "bills" and "Acts" alike the notion that they have already been "passed by the Legislature" by the time a people's veto petition has been filed. Me. Const. art. IV, pt. 3, § 17(1).

[¶20]  We disagree with the Committee's contention that the plain language resolves the present matter and conclude that the meaning of the word "passed" in sections 16 and 17 is ambiguous. We turn, therefore, to examine the provisions' history and purpose. *See Voorhees*, 2006 ME 79, ¶ 6, 900 A.2d 733.

[¶21]  These provisions derive from Amendment XXXI to the Maine Constitution, which established Maine's initiative and referendum process during a nationwide proliferation of direct popular democracy in the early twentieth century. *See* Resolves 1907, ch. 121; *Farris ex. Rel. Dorsky v. Goss*, 143 Me. 227, 230-31, 60 A.2d 908 (1948); David Schuman, *The Origin of State Constitutional Direct Democracy: William Simon U'Ren and the "Oregon System*,"

---

[4]    *Act  &  Bill*, State of Maine Legislature Glossary of Terms, https://legislature.maine.gov/LawMakerWeb/glossary_of_terms.asp (last visited Aug. 6, 2020).

67 Temp. L. Rev. 947, 948 (1994). We have observed that the broad purpose of the referendum is "obvious": to render "the legislative power not final but subject to the will of the people." *Moulton v. Scully*, 111 Me. 428, 448, 89 A. 944 (1914); *see* Lawrence L. Pelletier, *The Initiative and Referendum in Maine*, 16 Mun. Res. Series (Bureau for Res. in Mun. Gov't, Bowdoin C.), Mar. 1951, at 8-9. That the amendment was intended to effectuate a "fundamental change in the existing form of government," *Farris*, 143 Me. at 230, 60 A.2d 908, is reflected in its other provisions[5] as well as in the high pitch of the legislative debate in the sessions leading up to its passage. *See* Legis. Rec. 638-649 (1907); *cf.* Legis Rec. 775-82, 841-42 (1905).

[¶22] The history and purpose of these provisions shed some light on the "complicated machinery" of their text. *Moulton*, 111 Me. at 448, 89 A. 944. Considering the ninety-day period that is mirrored in sections 16 and 17, it is clear that the "purpose of the 90 day suspension in section 16 is to allow time in which legislative acts or resolves may be subjected to the people's veto under section 17." *Opinion of the Justices*, 682 A.2d 661, 666 (Me. 1996); *see* Tinkle,

---

[5] For instance, the amendment also changed the styling of Maine's laws. Prior to its enactment, laws were entitled, "Be it enacted by the Senate and House of Representatives in Legislature assembled"; ever since, laws bear the title, "Be it enacted by the People of the State of Maine," such that the "people and not the Legislature [are] the real arbiters of the laws to be finally accepted." *Moulton v. Scully*, 111 Me. 428, 448, 89 A. 944 (1914).

*The Maine State Constitution* 98-99 (2d ed. 2013).  Indeed, the legislative history of Amendment XXXI—although sparse and, on its own, inconclusive on the specific procedural issue before us—reflects a tacit understanding among the amendment's enactors that the ninety-day period in section 17 was meant to correspond with the ninety-day period in section 16, the latter being the point at which laws passed by the Legislature generally become *effective.*[6]  *See* Legis. Rec. 640-645 (1907); Legis. Rec. 775, 830 (1905).  Other interpretations over the years have joined in this understanding.  *See, e.g.*, Op. Me. Att'y Gen. 79-170; Pelletier, *The Initiative and Referendum in Maine*, 16 Mun. Res. Series (Bureau for Res. in Mun. Gov't,  Bowdoin C.), Mar. 1951, at 16 ("Statutes enacted by the legislature, with certain exceptions, do not become effective until ninety days after the recess of the session approving the measure, and during

---

[6] Not only does there exist a clear textual connection between section 16's suspension of effective dates "until 90 days after the recess of the session of the Legislature in which [legislation] was passed" and section 17's 90-day period within which to file a people's veto petition challenging measures "passed by the Legislature but not then in effect by reason of the provisions of [Section 16]" as those constitutional provisions were enacted, but an earlier version of the initiative and referendum amendment, which garnered majority votes in both houses but not by the two-thirds required for a constitutional amendment, *see* Legis. Rec. 785, 834-35, 855 (1905), had likewise been explicit about the synchrony between the period before a law becomes effective and the period in which a referendum petition may be filed.  That bill provided as follows:

> No act of the legislature not passed to be enacted by a two-thirds vote of each house . . . shall take effect until ninety days after the recess of the legislature passing it.  Any act, if ten per cent of the voters . . . , by petition signed and filed with the secretary of state *within said time*, shall so request, shall be submitted to the people . . . .

S.D. 244 (72nd Legis. 1905) (emphasis added).

this period it is possible for the people to invoke a referendum on the proposal.").

[¶23]  Although this purpose of the referendum is clear, neither of the parties' interpretations of the text of these provisions is perfectly reconcilable with that purpose.  The language of Maine's Constitution measures the period beyond which a referendum petition may not be filed not from the date an act becomes law but rather from "the recess of the session of the Legislature in which it was passed."  Me. Const. art. IV, pt. 3, § 16.  *But see* Mass. Const., art. 48, The Referendum, III, § 3 (measuring the duration from when "the law that is the subject of the petition has *become law*" (emphasis added)).  Ordinarily, by the close of the ninety-day period following the Legislature's passage of a bill, the Governor would have weighed in pursuant to Me. Const. art. IV, pt. 3, § 2. But Maine's Constitution contains a unique procedural process; it grants the Governor a three-day window in which to act on a bill—after a recess—when the same Legislature's early adjournment prevented the Governor from having ten days to respond to the bill.  *See* Me. Const. art. IV, pt. 3, § 2.  This unique process is not found in other state constitutions with otherwise similar people's veto schemes.[7]

---

[7] Using the Nebraska Constitution as an example, a section similar to Me. Const. art. IV, pt. 3, § 17 provides that a people's referendum petition must be "filed in the office of the Secretary of State

18

[¶24] The trouble with the Committee's position is that it leads to a result whereby the deadline for invoking a people's veto of a law would fall *before* the date the law could take effect. It is unlikely that the framers intended a result in which people were expected to petition for a people's veto before it is clear that the act in question will be approved; if the Governor opts to veto an act during the three-day window after the "next meeting of the Legislature which enacted the bill," Me. Const. art. IV, pt. 3, § 2, the work involved in the petition would have been wholly unnecessary, *see* Me. Const. art. IV, pt. 3, §§ 2, 16-17; Op. Me. Att'y Gen. 79-170.

[¶25] We recognize that because the Governor's decision to allow the bill to become law was effectively delayed until the first three days of the Second Regular Session, the effective date of the Act was also delayed until ninety days following the Second Regular Session's March 17, 2020, recess. This extended the veto petition deadline to June 15, 2020 (a date that would very likely have

within ninety days after the Legislature at which the act sought to be referred was passed shall have adjourned sine die or for more than ninety days." Neb. Const. art. III, § 3. Similar to Me. Const. art. IV, pt. 3, § 16, the Nebraska Constitution states that "[n]o act shall take effect until three calendar months after the adjournment of the session at which it passed, unless in case of emergency." Neb. Const. art. III, § 27. However, Nebraska's Constitution does not mirror the unique provision found in Me. Const. art. IV, pt. 3, § 2 providing the Governor a three-day window during the next meeting of the same Legislature should the Legislature's adjournment prevent the Governor's return of the bill. Instead, it provides that where the Legislature prevents the Governor's return of the bill by its adjournment, the Governor may file the bill "in the office of the Secretary of State within five days after such adjournment, or [the bill] become[s] a law." Neb. Const. art. IV, § 15. Hence, the extension of the Governor's opportunity to respond until the next meeting of the Legislature found in the present situation would not occur under the Nebraska Constitution.

occurred even later had the Legislature not been forced to adjourn due to the COVID-19 pandemic). Whether this result was anticipated or intended by the drafters of Me. Const. art. IV, pt. 3, §§ 16 and 17, it is the result required by the language, purpose, and history of those sections.

[¶26] Notwithstanding this possible shortcoming, we conclude that the Secretary's understanding is the better construction. We have observed that "[c]onstitutional provisions are accorded a liberal interpretation in order to carry out their broad purpose, because they are expected to last over time and are cumbersome to amend." *Allen*, 459 A.2d at 1102. This liberal interpretation is especially important in the context of the people's "absolute" right "to enact legislation and approve or disapprove legislation enacted by the [L]egislature," a right that "cannot be abridged directly or indirectly by any action of the Legislature." *Farris*, 143 Me. at 231, 60 A.2d 908.

[¶27] This principle of construction, coupled with the clear purpose of the ninety-day period to afford the time to invoke a people's veto until a law's effective date, lead us to conclude that the word "passed" in sections 16 and 17 of article IV, part 3, of the Maine Constitution signifies the completion of the legislative process rather than the Legislature's actions within that process. *Cf. Moulton*, 111 Me. at 448, 89 A. 944 (observing, in holding that a resolution

20

calling for the removal of a sheriff was not subject to the referendum process, that the referendum process was "intended to apply only to acts or resolves . . . having the force of law . . . which are passed by both branches [and] are usually signed by the governor," and citing for that proposition the force of law clause in Me. Const. art. IV, pt. 3, § 2 (emphasis omitted) (quotation marks omitted)). The legislative process for enactment is not complete until the Governor has had the opportunity to consider the bill.[8]  *See* Me. Const. art. IV, pt. 3, § 2; *Stuart v. Chapman*, 104 Me. 17, 23, 70 A. 1069 (1908) ("The approval of the governor was the last legislative act which breathed the breath of life into these statutes and made them a part of the laws of the State."). Thus, in answer to reported Question I, we conclude that the Second Regular Session of the 129th Legislature served as the "session of the Legislature in which [the law] was passed," Me. Const. art. IV, pt. 3, § 16, pursuant to sections 16 and 17. And we answer Question II in the negative and hold that P.L. 2019, ch. 539, was set to become effective on June 15, 2020, "90 days after the recess of" the Second Regular Session, Me. Const. art. IV, pt. 3, § 16, and was suspended upon the filing of the people's veto petition, *see* Me. Const. art. IV, pt. 3, § 17(2).

---

[8] We agree with Kouzounas's structural observation that the placement of the provision regarding presentment to the Governor within article IV part 3, entitled "Legislative Power," Me. Const. art. IV, pt. 3, supports our understanding that the Governor's role is the last necessary step in the legislative process.

B.     Question III

[¶28]  In the alternative, the Committee argues that the application for the people's veto violated 21-A M.R.S. § 901(1).  The Constitution enables the Legislature to enact laws "not inconsistent with the Constitution for applying the people's veto and direct initiative" and for establishing "procedures for determination of the validity of written petitions."  Me. Const. art. IV, pt. 3, § 22; *see McGee v. Sec'y of State*, 2006 ME 50, ¶ 9, 896 A.2d 933.  The Constitution directs that a completed people's veto petition must be "filed in the office of the Secretary of State by the hour of 5:00 p.m., on or before the 90th day after the recess of the Legislature" in which the challenged act was passed.  Me. Const. art. IV, pt. 3, § 17(1).  The Constitution does not dictate timing requirements for filing an initial application for a people's veto petition.  Instead, to regulate the filing of an application, the Legislature enacted subsection 901(1), entitled "Limitation on petitions," which provides in relevant part,

> An application for a people's veto referendum petition must be filed in the Department of the Secretary of State *within 10 business days after* adjournment of the legislative session at which the Act in question was passed.

21-A M.R.S. § 901(1) (emphasis added).  The Committee contends that the phrase "within 10 business days after" must be construed to establish not

simply an end date but also a start date—the Legislature's adjournment—for filing an application for a people's veto. Thus, it suggests that Kouzounas, who filed applications on September 10, 2019, and on January 16, 2020—but not in the ten-business-day window following the adjournment of the Second Regular Session—did not file a valid veto application. In contrast, the Secretary and Kouzounas argue that section 901(1) sets only an end date and not a beginning cutoff, and therefore, Kouzounas's early filing was valid.

[¶29] We agree with the latter contention and note that, although we have not interpreted section 901(1) before, we find persuasive the Superior Court's interpretation in *Remmel v. Gwadosky*, No. AP-97-112 (Me. Super. Ct., Cumberland Cty., Nov. 21, 1997). Just as we interpret constitutional provisions "liberally . . . to facilitate, rather than to handicap, the people's exercise of their sovereign power to legislate," *Allen*, 459 A.2d at 1102-03, so too do we afford a liberal interpretation to statutes regulating that right, *see Hernett v. Meier*, 173 N.W.2d 907, 911-12 (N.D. 1970).

[¶30] In *Allen*, we examined whether the constitutional provision governing the people's initiative, which required that an initiative petition be "filed in the office of the Secretary of State . . . on or before the fiftieth day after the date of convening of the Legislature in first regular session," prescribed a

starting date before which applications could not be filed. 459 A.2d at 1098-1101, 1099 n.5 (quotation marks omitted) (citing Me. Const. art. IV, pt. 3., § 18(1)). We affirmed our principle of construing constitutional provisions liberally in order to effectuate their broad purpose, observing the procedural specificity the Legislature provided the initiative process, which extended to "prescribing five o'clock p.m. as the hour of the filing deadline for initiative petitions." *Id.* at 1102-03. We concluded that "a court must be chary of reading another time limitation into section 18(1) by implication" and should require additional procedures "only if they are clearly necessary to achieve consistency with other constitutional provisions or to accomplish the general purpose of the direct initiative." *Id.* at 1103. Finding no such necessity, we held that section 18(1) did not prohibit the early filing of an application. *Id.*

[¶31] The Superior Court in *Remmel* was guided by a decision of the Nebraska Supreme Court, in which that court concluded that language in its state constitution dictating that referendum petitions must be "filed in the office of the Secretary of State *within ninety days after* the Legislature at which the act sought to be referred was passed shall have adjourned sine die or for more than ninety days," Neb. Const., art. III, § 3 (emphasis added), created only an end date and did not fix a starting cutoff, *see Klosterman v. Marsh*,

143 N.W.2d 744, 749 (Neb. 1966); *Remmel v. Gwadosky*, No. AP-97-112 (Me. Super. Ct., Cumberland Cty., Nov. 21, 1997). Other courts have likewise construed "within" to set only an end date and not a start date. *See, e.g.*, *District of Columbia v. Gantt*, 558 A.2d 1120, 1122-24 (D.C. 1989); *Southall v. State*, 796 S.E.2d 261, 265 (Ga. 2017) (collecting cases and stating that "[t]he word 'within,' when used with reference to time, is generally a word of limitation that means 'not beyond' or 'not later than'—fixing the end, but not the beginning, of a period").

[¶32] Finally, we are unpersuaded by the Committee's policy argument that fairness demands that every people's veto proponent be allotted an equal ten-day period in which to file an application. As the Secretary responds, a people's veto application process is not a "horse race." Different groups of citizens may wish to challenge different bills for different reasons and are not in direct competition with one another. In addition, early filing of an application may be a "boon" rather than a "burden" to the Secretary of State's office in processing applications. *Allen*, 459 A.2d at 1101.

[¶33] In sum, we construe 21-A M.R.S. § 901(1) to set only an end date for the filing of applications for a people's veto and not a starting cutoff that

would prohibit the early filing of an application prior to the Legislature's adjournment. We therefore answer reported Question III in the affirmative.

The entry is:

> Report accepted. Remanded to the Superior Court for entry of judgment.

---

James G. Monteleone, Esq. (orally), Eviana L. Englert, Esq., and Glenn Israel, Esq., Bernstein Shur, Portland, for appellants Clare Hudson Payne et al.

Aaron M. Frey, Attorney General, and Phyllis Gardiner, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee Secretary of State

Ann R. Robinson, Esq., and Joshua D. Dunlap, Esq. (orally), Pierce Atwood LLP, Portland, for appellee Demitroula Kouzounas

Kennebec County Superior Court docket number CV-2020-50
For Clerk Reference Only